## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| **KIM GUNTER**, <br><br> *Plaintiff,* <br><br> v. <br><br> **DREXEL UNIVERSITY**, <br><br> *Defendant.* | **Case No. 2:23-cv-02451-JDW** |

## <u>MEMORANDUM</u>

When Kim Gunter came to work at Drexel University as the Chief Compliance, Privacy & Internal Audit Officer, she probably hoped for a warm welcome. But in at least one notable case, she didn't get it. Bill Shea, one of her direct reports, made clear that he didn't like reporting to Ms. Gunter, and the two of them didn't get along. Ms. Gunter has offered just enough evidence to suggest that Mr. Shea (and his subordinates) treated Ms. Gunter the way they did because of her sex, race, and color, and she has evidence that Drexel knew about it and didn't do enough to stop it. She therefore has enough evidence to let a jury decide her hostile work environment claims to the extent they arise from the way that Mr. Shea and members of his department treated her.

The rest of Ms. Gunter's claims, however, lack evidence to proceed to a jury. She posits a range of other acts by other people that made her work environment hostile, but she doesn't have evidence to support that claim. She also claims disparate treatment and

retaliation, but her evidence falls short there, too. Thus, I will grant summary judgment on most—but not all—of Ms. Gunter's claims.

I.    **BACKGROUND**

   A.    **Employment At Drexel And Administrative Oversight Of Internal Audit**

   Ms. Gunter started working at Drexel on July 8, 2019, as Vice President, Chief Compliance, Privacy & Internal Audit Officer. Ms. Gunter is a Black, African-American woman. She replaced Edward Longazel, who is a White man. Both Mr. Longazel and Ms. Gunter reported to Helen Bowman, Executive Vice President, Treasurer, and Chief Operating Officer at Drexel. Prior to Ms. Gunter's arrival, Mr. Longazel exercised administrative (as opposed to operational) oversight over Drexel's Internal Audit Department ("IA Department"). Bill Shea was the Associate Vice President and Chief Audit Executive for the IA Department. In that role, he reported to Drexel's Audit Committee for operations and to Mr. Longazel for administrative purposes. Prior to Ms. Gunter taking over, Mr. Shea never suggested that he or anyone else at Drexel was confused about who oversaw the IA Department. However, things changed once Ms. Gunter arrived.

   After Mr. Longazel's departure, Mr. Shea resisted Ms. Gunter's efforts to exercise administrative control over the IA Department. For example, during a meeting in August 2019, Mr. Shea explained that while he reports to the Audit Committee for operations purposes, he reports to Ms. Gunter administratively "because someone has to sign his

time sheet." (ECF No. 76-27 at 2.) The same month, he failed to include Ms. Gunter when interviewing a new employee, even though Ms. Gunter was part of the hiring process.

Things came to a head during an executive session of the Audit Committee in March 2020, when Mr. Shea complained to the Audit Chair, Mike Williams, about being "under" Ms. Gunter. (ECF No. 80-14 at 3.) Mr. Shea was "aggressive" during the meeting (ECF No. 80-13 at 2) and complained that Ms. Gunter was "becoming more involved [with] internal audit than he was comfortable with." (ECF No. 76-8 at 55:12-19). He also claimed that her involvement created confusion among management about who oversaw the IA Department, but there is no evidence that anyone else at Drexel expressed confusion in this regard. Mr. Williams and Ms. Bowman "were both surprised" by Mr. Shea's complaint about having to report to Ms. Gunter. (ECF No. 76-8 at 71:9.) They noted that the relevant parties' titles and reporting structure had been the same when Mr. Longazel was at Drexel, and they found it "odd" that Mr. Shea was "making it such an issue." (ECF No. 80-14 at 2.) They also "talked about how his attitude [had] totally changed." (*Id.*)

On April 16, 2020, Ms. Gunter had a one-on-one meeting with Ms. Bowman during which she raised issues about Mr. Shea and his treatment of her since she arrived at Drexel. She followed up with an email on April 22, 2020, detailing additional incidents in which Mr. Shea resisted or challenged her oversight of the IA Department. She reported that Mr. Shea "does not think that I should provide any substantive management of Internal Audit, or that Internal Audit should participate fully in Office leadership." (ECF No. 76-12 at 2.)

On April 27, 2020, Ms. Bowman wrote to Mr. Shea and noted that he had "on a few occasions questioned [Ms. Gunter] in how I would describe as disrespectful to her being your manager[.]" (ECF No. 80-15 at 2.) She explained that Mr. Shea and his team reported to Ms. Gunter on an administrative basis and that Ms. Gunter deserved Mr. Shea's and his team's respect and collaboration. She also noted that the reporting structure was "no different than when [Mr. Longazel] was here, but you [(i.e. Mr. Shea)] seem to have issue now." (*Id.*) Ms. Bowman concluded by advising that her email constituted "a verbal warning" and that she would take further action absent improvement from Mr. Shea. (*Id.* at 3.)

Following the verbal warning, Mr. Shea continued to engage in similar behavior, including:

- In June and July 2020, Mr. Shea and one of his reports, Michael D'Arco, challenged the inclusion of Internal Audit in a newsletter and provided articles that did not align with the vision that Ms. Gunter communicated;

- In September 2020, Mr. Shea or Mr. D'Arco failed to include Ms. Gunter's suggested edits in the Audit Committee Minutes and Agenda. When Ms. Gunter asked if they received her edits, Mr. Shea "made a point" to say that there were three typos in her suggested edits. And when she asked for certain edits in the headers, Mr. Shea "resisted." "This continued for a couple committee cycles" until Ms. Bowman and Mr. Williams approved the edits; and

- In September 2020, Mr. Shea withdrew one of his reports, Raffaele Fusca, from participating in an ERM[1] Committee meeting even though Ms. Gunter requested that Mr. Fusca remain present.

---

[1]    I assume ERM is an abbreviation for Enterprise Risk Management.

(ECF No. 76-27 at 3-4.)

In the meantime, Ms. Bowman explored whether to change Ms. Gunter's title. Following the March 2020 Audit Committee meeting, Ms. Bowman emailed Megan Weyler, Vice President and Chief Human Resources Officer at Drexel, and asked her to look at other universities that include internal audit oversight under the Chief Compliance Officer and "see what the titles are." (*Id.* at 3.) In October 2020, Ms. Bowman reported to Mr. Williams and former President John Fry that most peer universities had IA reporting to someone in her position, rather than to the Chief Compliance Officer. Ms. Bowman and Mr. Williams preferred to keep the reporting structure as it was, to take advantage of synergies between the two departments, but Ms. Bowman proposed dropping IA from Ms. Gunter's title to ensure independence of the IA Department.

On November 16, 2020, Ms. Bowman sent Ms. Gunter a list of different titles that she was considering for Ms. Gunter. She did not ask Ms. Gunter if Ms. Gunter was comfortable with the change in title, though she did ask her which title Ms. Gunter would prefer. Based on Ms. Gunter's preference, Ms. Bowman changed Ms. Gunter's title to Vice President and University Chief Compliance and Privacy Officer.

On November 19, 2020, Ms. Bowman advised Mr. Shea of the change to Ms. Gunter's title and made clear that there would be no change to the reporting structure. Mr. Shea would still report to Ms. Gunter "managerially," and she could continue to have one-on-one meetings with him and any members of his team as she deemed necessary.

(ECF No. 76-25 at 2.) Aside from the change in title, there was no reduction in Ms. Gunter's salary, benefits, responsibilities, or budget, and Mr. Shea continued to report to her for administrative matters.

Following the change to Ms. Gunter's title, Mr. Shea would point out instances where he thought references to IA were inappropriate or incorrect. For example, in January 2021, he told Ms. Gunter that IA should be removed from the heading of ERM Committee meeting minutes and opined that Ms. Gunter's title "should be updated" given the recent change. (ECF No. 76-27 at 4.) Similarly, in July 2021, Mr. Shea reviewed a draft compliance plan and "scoffed at the mention of Internal Audit in the initial draft." (*Id.* at 5.) He also took issue with being a member of the Compliance Committee but said that he would participate "because Mike Williams told him to." (*Id.*)

In July and August 2021, Mr. D'Arco ignored Ms. Gunter's instructions regarding his participation in a virtual meeting, and he pushed back when she attempted to schedule a one-on-one meeting with him. In both instances, Mr. Shea—Mr. D'Arco's supervisor— failed to reprimand Mr. D'Arco, nor did he try to correct Mr. D'Arco's behavior. After Mr. D'Arco challenged the one-on-one meeting in an email, Ms. Gunter copied Ms. Bowman on her response. At that point, Ms. Bowman copied Mr. Shea and responded:

> I will be setting up a meeting with myself, Xavier from Human Resources and Internal Audit to discuss issues that have occurred since Kim's arrival that I view as unnecessary.

> It is clear to everyone that Internal Audit reports to the Audit Committee, but administratively this function reports into [Ms. Gunter].

*\*\**

Everyone in Internal Audit is to actively and respectfully participate in team meetings, updates, these 1 on 1s, etc. and [Mr. Shea] as the lead of this department, I expect you to ensure this as well as lead in this manner.

(ECF No. 76-28 at 2.)

Nevertheless, Mr. Shea's and Mr. D'Arco's behavior continued. For example:

- In April 2022, when Ms. Gunter's and Mr. Shea's respective departments were moving offices, Mr. Shea and Mr. D'Arco bypassed Ms. Gunter in communications regarding the move, despite the fact that Ms. Gunter was the point person;

- In June 2022, Mr. Shea sent Ms. Gunter an email of "clean up items," in which he identified places on the Drexel website, Ms. Gunter's bio, and in a newsletter where he believed her title should be updated to reflect the prior change;

- In July 2022, there was an incident between Mr. D'Arco and Mr. Fusca in IA. When Ms. Gunter asked Mr. Shea—her report—for information about what happened, he refused to provide it to her; and

- On October 26, 2022, no one from the IA Department attended a regularly scheduled team meeting without providing notice to Ms. Gunter, who called the meeting.

(*See* ECF No. 76-27 at 5-6.)

At different times during her employment at Drexel, Ms. Gunter requested that Drexel remove the IA Department from her oversight. For example, during a meeting with Ms. Bowman on September 30, 2021, Ms. Gunter requested that Ms. Bowman change the reporting structure so that the IA Department would no longer report to her. Ms. Bowman denied Ms. Gunter's request. When meeting with Xavier Johnson, Human Resources Business Partner, in August 2022 to discuss her complaints about Mr. Shea, Ms. Gunter

told Mr. Johnson that she wanted Drexel to change the reporting structure so that Mr. Shea and his team were no longer under her. Then, during her 2022 Performance Review, Ms. Gunter again asked Ms. Bowman for "relief from continued management of the Internal Audit team …." (ECF No. 76-13 at 3.)

During that same review period, Ms. Gunter advised Ms. Bowman that she could not give Mr. Shea a good performance review, and Mr. Shea complained when he saw his review. On December 6, 2022, Ms. Bowman wrote to Mr. Shea that as of that date, the IA Department would no longer report to Ms. Gunter, stating that: "The two of you just don't get along well enough to realize the synergies the Audit Committee and the University we [sic] were hoping for. That said, you are both solid/important resources to the University, so I am going to separate the offices and give the new reporting structure a try." (ECF No. 76-42.) When Ms. Bowman removed the IA Department from Ms. Gunter's administrative oversight, there was no decrease in Ms. Gunter's salary or benefits. However, she had less responsibilities with fewer people to supervise. Ms. Gunter received merit increases in 2022 and 2023.

### B.    Ms. Gunter's Internal Complaints About Mr. Shea

On July 27, 2022, Ms. Gunter wrote to Mr. Johnson in HR and asked to speak with him as soon as possible regarding Mr. Shea, stating that her interaction with him that day "was the most recent episode of insubordination and discrimination. This has become a hostile work environment for me." (ECF No. 76-15.) It is not entirely clear from the record,

but it appears that Ms. Gunter was referring to Mr. Shea's refusal to provide her with information about an altercation between Messrs. D'Arco and Fusca. She had a virtual meeting with Ms. Bowman and Mr. Johnson on August 2, 2022, to discuss the underlying incident, as well as Mr. Shea's "disrespect, microaggressive actions and statements" towards her. (ECF No. 80-18 at 3.) During the meeting, Ms. Bowman "said that there needs to be a final note in [Mr. Shea's] file and some training for him." (*Id.*) And she noted that Ms. Gunter "should not have to continue to deal with the stress of this relationship and has been doing so since she got here." (*Id.*)

On August 8, 2022, Ms. Gunter met with Mr. Johnson again to outline all the issues she had with Mr. Shea and to go over the various examples of how he disrespected her and disregarded her authority. Two days later, Ms. Gunter wrote to Mr. Johnson and confirmed that she wanted HR to investigate Mr. Shea's behavior. Mr. Johnson said he would be in touch regarding a follow-up meeting. Ms. Gunter went out on medical leave due to stress on August 19, 2022, and returned on October 25, 2022. Mr. Johnson did not take any further steps to investigate Mr. Shea while Ms. Gunter was out on leave.

When Ms. Gunter returned to the office, she followed up with Mr. Johnson on two occasions regarding the status of her complaint about Mr. Shea. She also emailed him a list of incidents she had had with Mr. Shea over the years that she contended displayed his "resistance and hostility" towards her and her leadership. (ECF No. 76-40 at 4.) Despite exchanging emails back and forth for many weeks, Mr. Johnson did not take any further

action on Ms. Gunter's complaint until February 9, 2023, when he responded to Ms. Gunter that he would be hiring outside counsel to investigate her complaint against Mr. Shea. He hired Jesse Krohn, a former Drexel employee, to handle the investigation. Ms. Krohn interviewed witnesses and reviewed documents as part of her investigation. On May 25, 2023, she issued her findings that Ms. Gunter did not experience discrimination based on race or sex.

In the meantime, on April 20, 2023, Mr. Shea submitted an EIC[2] Incident Report to Drexel, alleging that Ms. Gunter had discriminated against him based on race, color, and sex. Ms. Gunter learned about Mr. Shea's complaint on May 30, 2023, when she received a letter advising her that Drexel was opening an investigation. Ms. Gunter believed that Mr. Shea's EIC complaint against her was retaliatory because he filed it after learning about her allegations of discrimination against him. She advised members of EIC and the external investigator that she felt that Mr. Shea's complaint was retaliatory and not made in good faith. Ms. Gunter claims that Drexel did not investigate her claim of retaliation.

## C.    Procedural History

On June 27, 2023, Ms. Gunter filed her employment discrimination Complaint against Drexel in this Court. The next day, she filed a charge of discrimination with the Philadelphia office of the Equal Employment Opportunity Commission that was dual filed with the Pennsylvania Human Relations Commission, alleging violations of the

---

[2]       "EIC" refers to Drexel's Office for Institutional Equity and Inclusive Culture.

Pennsylvania Human Relations Act and Title VII. Ms. Gunter amended her Complaint twice, and in her operative Second Amended Complaint, she asserts claims against Drexel for hostile work environment, disparate treatment, and retaliation based on race, color, and sex, in violation of 42 U.S.C. § 1981 ("Section 1981), Title VII of the Civil Rights Act of 1964, and/or Title IX of the Education Amendments of 1972. Following discovery, Drexel moved for summary judgment on all of the claims asserted against it, and the motion is ripe for disposition.

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) permits a party to seek, and a court to enter, summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In ruling on a summary judgment motion, a court must "view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion.'" *Scott v. Harris*, 550 U.S. 372, 378 (2007) (quotation omitted).

However, "[t]he non-moving party may not merely deny the allegations in the moving party's pleadings; instead, [s]he must show where in the record there exists a genuine dispute over a material fact." *Doe v. Abington Friends Sch.*, 480 F.3d 252, 256 (3d Cir. 2007) (citation omitted); *see also* Fed. R. Civ. P. 56(c)(1)(A)-(B). If she fails to make this showing, then the court may "consider the fact undisputed for purposes of the motion" and/or "grant summary judgment if the motion and supporting materials — including the

facts considered undisputed — show that the movant is entitled to it[.]" Fed. R. Civ. P. 56(e)(2), (3).

## III.   ANALYSIS

### A.   Hostile Work Environment[3]

#### 1.   Harassment by Mr. Shea and the IA team

##### a.   Merits

To establish her claim that Mr. Shea (and the IA Department that he oversaw) subjected her to a hostile work environment, Ms. Gunter must prove: "(1) she suffered intentional discrimination because of her race or sex; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected her; (4) the discrimination would detrimentally affect a reasonable person in like circumstances; and (5) [there was] *respondeat superior* liability." *Nitkin v. Main Line Health*, 67 F.4th 565, 570 (3d Cir. 2023) (quotation omitted). Acts of harassment need not be "accompanied by racially [or sexually] discriminatory statements" to create an actionable hostile work environment. *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1083 (3d Cir. 1996). Instead, "[a]ll that is required is a showing that race [or sex] is a substantial factor in the harassment, and that if the plaintiff had been white [or male] she would not have been treated in the same manner." *Id.* Ms. Gunter has just enough evidence to create a dispute as to each element.

---

[3]   Ms. Gunter does not assert a hostile work environment claim under Title IX, only under Title VII and Section 1981. (*See* ECF No. 21.)

*First*, Ms. Gunter can demonstrate discrimination because of race or sex based on the way that Mr. Shea treated her as compared to Mr. Longazel. Ms. Gunter had the same title, position, and responsibilities as Mr. Longazel, including administrative oversight of the IA Department. As such, Mr. Shea was required to report to Ms. Gunter the same way he reported to Mr. Longazel before her. Yet there is substantial evidence that Mr. Shea's attitude changed once Ms. Gunter stepped into the role. In April 2020, Ms. Bowman documented that change in her first verbal warning to Mr. Shea, when she explained that the reporting structure was "no different than when Ed [Longazel] was here, but you seem to have issue now." (ECF No. 80-15 at 2.) And Mike Williams testified that he and Ms. Bowman "were both surprised" when Mr. Shea complained about having to report to Ms. Gunter. (ECF No. 76-8 at 71:9.) The two of them "discussed how this was the title and reporting structure under [Mr. Longazel], so why [Mr. Shea] is making it such an issue now is odd" and that "his attitude has totally changed." (ECF No. 80-14 at 2.) Mr. Williams also testified that Mr. Shea had never expressed confusion as to who oversaw the IA Department when Mr. Longazel was there. (*See* ECF No. 76-8 at 133:22 – 134:2, 146:1-7.) All things being equal, the noticeable change in Mr. Shea's behavior once Ms. Gunter (a black woman) replaced Mr. Longazel (a white man) is sufficient to create an inference of intentional discrimination based on race and sex.[4]

---

[4]     As Drexel notes in its brief, race and color are not synonymous. Because Mr. Longazel and Ms. Gunter have a different skin color and race, he can serve as a comparator

Drexel seeks to minimize this evidence by arguing that Mr. Shea treated Ms. Gunter the way he did because she had a different management style than Mr. Longazel. That might be true, and Drexel can argue it at trial. But it's by no means an undisputed fact. It's an issue for a jury to weigh, not me.

*Second*, Ms. Gunter offers evidence from which a reasonable jury could find that the discrimination was pervasive. While "offhanded comments, and isolated incidents (unless extremely serious)" are not sufficient to sustain a hostile work environment claim, a factfinder must "consider the 'totality of the circumstances.'" *Caver v. City of Trenton*, 420 F.3d 243, 262 (3d Cir. 2005) (quotations omitted). "As such, 'a discrimination analysis must concentrate not on individual incidents, but on the overall scenario.'" *Id.* at 262-63 (same). The individual examples of Mr. Shea's and other members of the IA Department's disrespectful or insubordinate behavior may seem like petty, interoffice slights in isolation, but they persisted again, and again, and again. They drew complaints from Ms. Gunter, discussion between Ms. Bowman and Mr. Williams, and reprimands from Ms. Bowman. Ms. Bowman acknowledged—on more than one occasion—that Mr. Shea's behavior had been happening "since [Ms. Gunter's] arrival" at Drexel in July 2019. (ECF No. 76-28 at 2; ECF No. 80-18 at 3). Thus, the combination of these events over the years—*i.e.* the overall

---

for both. While Ms. Gunter appears to treat the terms interchangeably in her briefing, Drexel is free to raise the distinction as a defense at trial.

scenario—could permit a jury to determine that the challenged behavior was pervasive enough to create a hostile work environment.

*Third*, there's no dispute, at least at this stage of the case, that the hostile work environment detrimentally affected Ms. Gunter.

*Fourth*, Ms. Gunter offers sufficient evidence that the discrimination would detrimentally affect a reasonable person in like circumstances. Again, Ms. Bowman's words are telling. During a conversation with Ms. Gunter in August 2022, Ms. Bowman opined that Ms. Gunter "should not have to continue to deal with ***the stress of this relationship***" with Mr. Shea. (ECF No. 80-18 at 3 (emphasis added).) That Ms. Bowman disputes making that statement or did not attribute Mr. Shea's behavior to discriminatory animus is not dispositive. A jury must resolve the Parties' competing viewpoints.

*Fifth*, and finally, Ms. Gunter has identified enough evidence to hold Drexel liable for some period that the alleged hostile work environment existed. "The basis of an employer's liability for hostile environment ... depends on whether the harasser is the victim's supervisor or merely a coworker." *Huston v. Procter & Gamble Paper Prod. Corp.*, 568 F.3d 100, 104 (3d Cir. 2009) (citation omitted). In this instance, Drexel will be liable for the conduct of non-supervisory coworkers like Mr. Shea and other members of the IA Department "only if ... [Drexel] knew or should have known of the harassment and failed to take prompt and appropriate remedial action." *In re Trib. Media Co.*, 902 F.3d 384, 400 (3d Cir. 2018) (quotation omitted). There's no dispute that Ms. Bowman and Mr. Williams

were aware of the harassment. And, while Ms. Bowman took some remedial action, there's enough evidence for a jury to conclude that the remedial action wasn't appropriate or prompt.

To determine whether Drexel's purported "remedial action was adequate, [I] must consider whether the action was 'reasonably calculated to prevent further harassment.'" *Knabe v. Boury Corp.*, 114 F.3d 407, 412 (3d Cir. 1997) (quotation omitted). On April 22, 2020, Ms. Gunter wrote to Ms. Bowman and detailed her issues with Mr. Shea, concluding: "he does not think that I should provide any substantive management of Internal Audit[.]" (ECF No. 76-12 at 2.) Less than a week later, on April 27, 2020, Ms. Bowman wrote to Mr. Shea to give him a verbal warning over the "disrespectful" way that he communicated with Ms. Gunter. (ECF No. 80-15 at 2, 3.) She explained that Mr. Shea and his team report to Ms. Gunter on an administrative basis and that Ms. Gunter deserves Mr. Shea's and his team's respect and collaboration. Maybe that was sufficient at that point.

But a reasonable jury could determine that things did not improve after Ms. Bowman's warning, and there is a genuine dispute as to whether her subsequent actions were reasonably calculated to prevent further harassment. On September 30, 2021, Ms. Bowman jumped-in after Ms. Gunter copied her on an email thread in which another member of the IA team, Mr. D'Arco, objected to participating in a 1:1 meeting with Ms. Gunter. In her response, Ms. Bowman included Mr. Shea and noted that she would be setting up a meeting with herself, Xavier Johnson from HR, and the IA Department "to

discuss issues that have occurred since [Ms. Gunter's] arrival that I view as unnecessary." (ECF No. 76-28 at 2.) She instructed that everyone in IA must "actively and respectfully participate" in meetings and updates with Ms. Gunter and noted that she expected Mr. Shea to "ensure this as well as lead in this manner." (*Id.*) Given the fact that these issues persisted—despite Ms. Bowman's issuance of a verbal warning to Mr. Shea over a year earlier—a jury could question whether Ms. Bowman's admonishing email and subsequent meeting with the IA Department was reasonably calculated to prevent further harassment.

In addition, a reasonable jury could conclude that the hostile work environment continued. For example, on August 2, 2022, Ms. Gunter had a meeting with Mr. Johnson and Ms. Bowman about a separate employee incident. During that meeting, Ms. Gunter complained about Mr. Shea's continued "disrespect, microaggressive [sic] actions and statements towards" her. (ECF No. 80-18 at 3.) Ms. Bowman remarked that Ms. Gunter "should not have to *continue* to deal with the stress of this relationship and *has been doing so since she got here* [(*i.e.* to Drexel)]." (*Id.* (emphasis added).) Ms. Bowman also "said that there needs to be a final note in [Mr. Shea's] file and some training for him" and that "[t]here needs to be some next steps ... for [Mr. Shea] that must be written." (*Id.*) It is not clear whether Ms. Bowman put a written warning in Mr. Shea's file or whether she ordered him to attend training. But Mr. Shea continued his pattern of disrespect and insubordination when Ms. Gunter returned from leave and he and his entire team failed to attend a scheduled meeting with her on October 26, 2022. Following that incident, Ms.

Gunter gave Mr. Shea a negative performance evaluation, and Ms. Bowman removed the

IA Department from Ms. Gunter's administrative oversight in December 2022. Ms. Gunter

does not contend that Mr. Shea or the IA Department subjected her to a hostile work

environment after that point. However, she has offered enough evidence such that a jury

could hold Drexel liable for a hostile work environment based on Mr. Shea and the IA

Department's conduct through October 26, 2022.

**b.      Timeliness**

Based on the date Ms. Gunter filed her charge of discrimination—June 28, 2023—

she may only assert claims under Title VII for acts that occurred after September 1, 2022,

given the applicable 300-day limitations period. Most of Ms. Gunter's evidence relating

to an alleged hostile work environment by Mr. Shea predates September 1, 2022.

However, pursuant to the continuing violations doctrine, when a defendant's conduct is

part of a continuing practice—like a hostile work environment—a plaintiff's claim will be

timely as long as the "acts which constitute the claim are part of the same unlawful

employment practice and ... at least one act falls within the applicable limitations period."

*Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 165–66 (3d Cir. 2013).

Ms. Gunter's claim of hostile work environment by Mr. Shea centers on his alleged

pattern of disrespecting her as his administrative supervisor, challenging or questioning

her authority, being insubordinate, and obstructing her efforts to exercise administrative

control over the IA Department. And she offers evidence that Mr. Shea continued this

18

pattern of disrespect at least until October 26, 2022, when Mr. Shea and his team failed to attend a meeting with Ms. Gunter without notice. A reasonable jury could conclude that this incident is part of the alleged pattern of disrespect and insubordination on Mr. Shea's part. Because this incident occurred during the 300-day limitations period, the continuing violations doctrine permits Ms. Gunter to seek relief based on conduct that occurred before September 1, 2022.

## 2.  Harassment by other Drexel employees

Ms. Gunter does not have sufficient evidence to support her other allegations about a hostile work environment at Drexel.[5] *First*, for most of her allegations, she has not

---

[5]      Aside from her complaints about Mr. Shea's and the IA Department's conduct, Ms. Gunter also appears to base her hostile work environment claims on a variety of discrete acts or omissions by a variety of different individuals at Drexel, including: (a) Mr. Johnson "threw out" her 2022 performance evaluation of Mr. Shea; (b) Mr. Johnson scheduled a performance review discussion about Mr. Shea before taking the time to discuss Ms. Gunter's formal complaint against him; (c) Drexel gave Mr. Shea a merit increase in December 2022; (d) Drexel "corrected" Mr. Shea's performance evaluation; (e) Drexel retained Jesse Krohn as the third-party external investigator for Ms. Gunter's internal complaint against Mr. Shea; (f) Ms. Krohn did not interview Mr. Longazel as part of her investigation; (g) Ms. Bowman discussed the decision to remove the IA Department from Ms. Gunter's oversight with Mr. Shea before she discussed it with Ms. Gunter; (h) Drexel decreased Ms. Gunter's office budget from $1,932,593 to $1,093,707 after the reporting restructure; (i) Mr. Shea filed his own complaint of discrimination against Ms. Gunter in May 2023; (j) Drexel failed to perform an EIC inquiry into Ms. Gunter's complaints that Mr. Shea's internal complaint against her was retaliatory and not made in good faith; (k) upon learning about Ms. Gunter's lawsuit in this Court, Ms. Bowman and Ms. Weyler, exchanged text messages between themselves that "expressed hostility towards Plaintiff raising 'succession planning' and calling the lawsuit 'shit!' and '21 pages of crap[;]'" (l) Drexel changed Ms. Gunter's job title in November 2020; (m) Ms. Bowman wrote that she hoped for "continued maturity and progress" in Ms. Gunter's 2022 performance evaluation; (n)

offered any evidence that anyone did anything because of her race or sex. Ms. Gunter's

conclusory and unsupported assertion that "[Ms.] Bowman and/or Drexel through its HR

department or Audit Committee took actions that adopted [Mr.] Shea's biases" (ECF No.

83-1 at 23-24) is not evidence and is therefore insufficient to overcome summary

judgment. Likewise, the fact that Ms. Gunter was the only African American woman of Ms.

Bowman's eleven direct reports does not support a finding that Ms. Bowman (or anyone

else) discriminated against Ms. Gunter based on her race or sex. The only evidence that

Ms. Gunter identifies that could, in some circumstances, permit an inference of race- or

sex-based conduct is Drexel's different treatment of her and Mr. Longazel.

The problem for Ms. Gunter is that for most of the incidents that she identifies,

there's no evidence that Drexel faced a similar situation during Mr. Longazel's tenure.

Most notably, many of Ms. Gunter's claims address how Drexel handled investigations of

complaints that she and Mr. Shea made about each other. There's no evidence that

anyone made internal complaints during Mr. Longazel's tenure. (It also doesn't matter if

Drexel handled Mr. Shea's and Ms. Gunter's complaints differently from each other

---

Ms. Bowman directed Ms. Gunter to request funds from the IT Department to purchase a research tool; (o) HR delayed in processing Ms. Gunter's complaint against Mr. Shea, in comparison to the speed with which it opened Mr. Shea's complaint against her; and (p) during an emergency meeting with Drexel's President, two individuals referred to the protestors and looters following George Floyd's murder as "those people." (ECF No. 83-1 at 16-17, 20, 22.)

because they were not similarly situated; she was more senior than Mr. Shea and complained about a subordinate.)

For other incidents, Ms. Gunter has no evidence that Drexel handled things differently during Mr. Longazel's tenure than during hers. For example, there's no evidence that Drexel handled Mr. Longazel's reviews of Mr. Shea differently than it handled Ms. Gunter's reviews.

*Second*, Ms. Gunter can't demonstrate that these incidents from other Drexel employees were severe and pervasive. The only incident that Ms. Gunter can identify as a difference in treatment during her tenure and Mr. Longazel's tenure has to do with the direction that she get money from another department's budget. But that's a single incident. Similarly, the reference to "those people" during a meeting about the George Floyd protests was a stray remark, and it's meaning is not clear enough to permit an inference of race- or sex-based bias in any event (certainly, the protesters at that time were not all one race or all one sex).

*Third*, Ms. Gunter cannot demonstrate any basis to hold Drexel liable for the instruction about her budget or any other stray remark. It's not clear that Ms. Gunter complained about either incident or put Drexel on notice of it; nor is it clear that it continued. Therefore, Ms. Gunter's hostile work environment claim based on these incidents cannot proceed.

**B.    Disparate Treatment**

Ms. Gunter's disparate treatment claims under Title VII, Title IX, and Section 1981 are subject to the familiar *McDonnell Douglas* burden-shifting framework.[6] *See Qin v. Vertex, Inc.*, 100 F.4th 458, 470 (3d Cir. 2024). Under that framework, a plaintiff-employee must prove a *prima facie* case of discrimination, the employer must articulate a legitimate, non-discriminatory reason for its action, and the employee must rebut that reason by showing that it is pretextual. *See In re Tribune Media Co.*, 902 F.3d 384, 392 (3d Cir. 2018) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973)).

**1.    *Prima facie* case**

To establish a *prima facie* case of discrimination, Ms. Gunter must show that: "(1) she is a member of a protected class; (2) she is qualified for her position; (3) she suffered an adverse employment action; and (4) "the action occurred under circumstances that could give rise to an inference of intentional discrimination." *Qin*, 100 F.3d at 473 (quotation omitted). "To establish a *prima facie* case at summary judgment, the evidence

---

[6]    Though the Third Circuit has not held that the *McDonnell Douglas* framework applies to Title IX claims, it has noted that "[c]ourts have frequently looked to Title VII authority for guidance with Title IX cases." *Doe by & through Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518, 534 n.103 (3d Cir. 2018). Indeed, the Court of Appeals applied the burden shifting framework to Title IX claims in a recent unreported decision, explaining that the Court "follow[s] the Supreme Court's lead in turning to Title VII, as 'the paradigmatic anti-discrimination law[,]' to apply the law in Title IX cases." *Dennison v. Indiana Univ. of Pennsylvania*, No. 22-cv-2649, 2023 WL 8595426, at *6 n.11 (3d Cir. Dec. 12, 2023) (quotation omitted). Given this, and the fact that Ms. Gunter does not object to the use of the framework to assess her Title IX claim, I will apply it.

must be sufficient to convince a reasonable factfinder to find **all** of the elements of [the] *prima facie* case." *Burton v. Teleflex Inc.*, 707 F.3d 417, 426 (3d Cir. 2013) (same) (emphasis added). Thus, "[i]f a plaintiff fails to raise a genuine dispute of material fact as to **any** of the elements of the *prima facie* case, she has not met her initial burden, and summary judgment is properly granted for the defendant." *Id.* (emphasis added). Here, Ms. Gunter cannot prevail on her disparate treatment claims because she cannot establish that an adverse employment action occurred under circumstances that could give rise to an inference of intentional discrimination.

Drexel does not challenge the first and second elements of Ms. Gunter's *prima facie* case as to her claims of sex and race/color discrimination. Thus, I start with the third element—the adverse employment action. Ms. Gunter contends that Drexel took adverse employment actions against her when it (a) changed her title in November 2020 and (b) removed the IA Department from her administrative management in December 2022.[7]

---

[7]    In her opposition brief, Ms. Gunter also asserts that she "avers numerous adverse (tangible) and materially adverse (intangible) employment actions taken by Drexel in addition to title change in November 2020 and removal of Shea/IA from her administrative management in December 2022[.]" (ECF No. 83 at 26.) In support of this assertion, she cites to allegations in her Second Amended Complaint, which are not evidence. *See Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1362-63 (3d Cir. 1992).

Ms. Gunter also points to evidence that when she asked Ms. Bowman for funds to purchase a research tool that she needed for her department, Ms. Bowman directed her to ask the director of IT for the funds to cover the cost. Ms. Gunter testified that telling her "to go to a peer to ask for money was humiliating" and made her subject to her peers. (ECF No. 82-3 at 540:7-9.) It is not surprising that Drexel did not make any argument as

This past term, the Supreme Court made clear that a plaintiff asserting disparate treatment need not establish that the alleged harm she suffered was "significant[,] ... serious, or substantial, or any similar adjective suggesting that the disadvantage to the employee must exceed a heightened bar." *Muldrow v. City of St. Louis, Missouri*, 601 U.S. 346, 355 (2024). Instead, "an adverse employment action means simply that the employee suffered 'some harm' to a term or condition of employment—in other words, that the employer treated the employee 'worse' because of a protected characteristic." *Peifer v. Bd. of Prob. & Parole*, 106 F.4th 270, 277 (3d Cir. 2024) (quoting *Muldrow*, 601 U.S. at 354). Ms. Gunter can satisfy this element by pointing to evidence of "'some' employment-related harm." *Id.*

The change to Ms. Gunter's title from "Vice President and Chief Compliance, Privacy and Internal Audit Officer" to "Vice President and University Chief Compliance and Privacy Officer" in November 2020 was not adverse. There was no corresponding change to her salary, benefits, job responsibilities, or budget, and Ms. Gunter doesn't offer any evidence or argument that suggests that this new title was somehow "worse" than her previous

---

to this alleged adverse employment action in its motion for summary judgment because Ms. Gunter did not raise this issue in any of the 153 paragraphs of her Second Amended Complaint. Because her pleading did not put Drexel on notice that she was alleging this additional adverse action, she cannot rely on it now as a basis for her disparate treatment or retaliation claims.

　　To the extent Ms. Gunter contends that Drexel took an adverse employment action against her when it disregarded or "corrected" Mr. Shea's 2022 Performance Review and awarded him a merit increase in 2022, she has no evidence, or argument, as to how those actions had a negative impact on the terms and conditions of *her* employment.

one. In addition, that title change occurred far more than 300 days before she filed her administrative complaint, so it would be untimely in any event.

However, once Drexel removed the IA Department from Ms. Gunter's administrative oversight in December 2022, she had fewer people to supervise. A jury could determine that this was an adverse employment action because Ms. Gunter had fewer responsibilities and oversight as a result. Ms. Gunter also contends that Drexel reduced her management budget as a result of removing the IA Department from her oversight, but she has not cited any evidence to support this assertion. Instead, she points to the allegations in her Second Amended Complaint, which are not evidence. *See Big Apple BMW*, 974 F.2d at 1362-63.

Nevertheless, Ms. Gunter cannot satisfy the fourth prong of her *prima facie* case because there is no evidence that Ms. Bowman removed the IA Department from Ms. Gunter's oversight under circumstances that give rise to an inference of intentional discrimination. *First*, Mr. Longazel is not an appropriate comparator in this instance because "comparator employees … must be similarly situated in 'all *material* respects," and Mr. Longazel did not experience the same negative working relationship with Mr. Shea. *Qin*, 100 F.4th at 474 (quotation omitted) (emphasis added). Thus, the fact that Ms. Bowman never removed oversight of the IA Department from Mr. Longazel's portfolio but did so for Ms. Gunter does not create an inference of intentional discrimination because they each had different working relationships with Mr. Shea and the IA Department.

*Second*, Ms. Gunter's reliance on a "cat's paw" theory of liability does not give rise to an inference of intentional discrimination either. This theory imposes liability on an employer if a non-decisionmaker's discriminatory act is the proximate cause of the adverse employment action. *See Staub v. Proctor Hosp.*, 562 U.S. 411, 420 (2011). To prevail on this theory, a plaintiff must prove three facts: (a) the non-decisionmaker acted with discriminatory intent to cause an adverse employment action; (b) the non-decisionmaker communicated with the decisionmaker; and (c) the decisionmaker relied on that communication in taking the adverse employment action against the employee. *See id.* at 422; *Crosbie v. Highmark Inc.*, 47 F.4th 140, 146 (3d Cir. 2022) (citations omitted). Ms. Gunter lacks evidence to establish any of those elements.

Construing the facts in a light most favorable to Ms. Gunter, a jury could conclude that Mr. Shea did not want to report to her on an administrative basis. At the same time, however, there is no evidence in the record that Mr. Shea *intended* for Drexel to remove the IA Department from Ms. Gunter's administrative oversight. There is no evidence of any communication from him to the decision-maker—Ms. Bowman—asking that Ms. Gunter no longer have administrative oversight of his department. On the contrary, it was Ms. Gunter who asked Ms. Bowman—on more than one occasion—that "the reporting structure ... be changed such that Internal Audit no longer reported" to her. (ECF No. 82-3 at 483:21 – 484:1.) In fact, in her 2022 Performance Review, Ms. Gunter reiterated her request and asked for "relief from continued management of the Internal Audit team ...."

(ECF No. 76-13 at 3.) It follows, then, that there is no evidence that Ms. Bowman relied on any communication from Mr. Shea when she decided to remove the IA Department from Ms. Gunter's supervision.

At most, Mr. Shea complained about being "under" Ms. Gunter in March 2020—more than 2 ½ years before Ms. Bowman decided to remove the IA Department from Ms. Gunter's administrative oversight. But given the length of time between Mr. Shea's complaint and Ms. Bowman's decision to remove Ms. Gunter from overseeing the IA Department, no reasonable jury could conclude that Mr. Shea's complaint was the proximate cause of that decision. As such, even if Mr. Shea had a discriminatory intent for Drexel to remove Ms. Gunter's oversight responsibility when he complained, Ms. Gunter failed to establish the final causation prong, dooming her theory of cat's paw liability.

### 2.    Pretext

Drexel articulated a legitimate, non-discriminatory reason for the change in Ms. Gunter's oversight: that Mr. Shea and Ms. Gunter did not "get along well enough to realize the synergies the Audit Committee and the University … were hoping for." (ECF No. 76-42.) Therefore, the burden shifts back to Ms. Gunter to show that Drexel's explanation was pretextual. To establish pretext, Ms. Gunter "must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve [Drexel's] articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of [Drexel's] action." *Qin*, 100 F.4th

at 474-75 (quotation omitted). She can meet this burden by "'painting the [employer's articulated reasons] as weak, implausible, contradictory, or incoherent' [or] 'by showing that the employer in the past had subjected [them] to unlawful discriminatory treatment, [or] that the employer treated other, similarly situated persons not of [their] protected class more favorably.'" *Canada v. Samuel Grossi & Sons, Inc.*, 49 F.4th 340, 347 (3d Cir. 2022) (quotation omitted). However, she cannot prevail by "show[ing] that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." *Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir. 1994).

Ms. Gunter has not offered any evidence that would permit a reasonable jury to conclude that Drexel's articulated non-discriminatory reason for the change in her oversight function was pretext. At most, she points to evidence that Mr. Shea did not treat Mr. Longazel with the same disrespect and insubordination he exhibited towards her. But, again, that does not create an inference that the decisionmaker—Ms. Bowman—had a discriminatory animus when she took the challenged employment action. As such, Ms. Gunter's disparate treatment claims fail for this reason as well.

### C.    Retaliation

Ms. Gunter's retaliation claims are subject to the same three-step burden shifting framework under *McDonnell Douglas*. Thus, to prevail on these claims, she must first establish a *prima facie* case by showing: (1) she engaged in protected employee activity;

"(2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between [their] protected activity and the employer's adverse action." *Canada*, 49 F.4th at 346 (quotation omitted). Drexel does not dispute that Ms. Gunter engaged in protected activity, so I will focus my analysis on the last two elements.

Unlike Title VII's anti-discrimination provision, the anti-retaliation provision "applies only when the retaliatory action is 'materially adverse,' meaning that it causes 'significant' harm." *Muldrow*, 601 U.S. at 348 (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)). This heightened requirement for retaliation claims is meant to "capture those employer actions serious enough to 'dissuade[ ] a reasonable worker from making or supporting a charge of discrimination.'" *Id.* (same). As I've already explained, the mere change to Ms. Gunter's title in November 2020—with no attendant harm to the terms, conditions, or privilege of her employment—is not an adverse employment action, much less a material one.

While the removal of the IA Department from Ms. Gunter's administrative supervision could constitute an adverse employment action, Ms. Gunter has not offered evidence that would lead a reasonable jury to conclude that this action was material—*i.e.* that it caused a ***significant*** harm to the terms, conditions, or privilege of her employment. Indeed, she has not put forth any evidence or argument to explain how or why the removal of that oversight role would dissuade a similarly situated employee from making

a charge of discrimination. On the contrary, Ms. Gunter, herself, asked Ms. Bowman for "relief from continued management of the Internal Audit team" during her 2022 Performance Review. (ECF No. 76-13 at 3.) After Ms. Bowman implemented the change in reporting structure, Ms. Gunter continued to receive the same salary and benefits as before. Because this was the outcome Ms. Gunter requested, no reasonable jury could conclude that the change in reporting structure constituted a material adverse employment action necessary to sustain a retaliation claim.

Ms. Gunter's claims of retaliation based on other alleged acts and omissions by Drexel fare no better. As an initial matter, Ms. Gunter's personal belief that Mr. Shea's EIC complaint against her was "retaliatory" and "not made in good faith" is not dispositive and does not mean that Drexel's opening of an investigation was materially adverse. Moreover, given the amount of time that passed between Ms. Gunter's initial complaint against Mr. Shea in July 2022 and the time he submitted his own complaint in April 2023, Ms. Gunter cannot demonstrate the necessary causal connection between her protected activity and Drexel's supposed retaliation by opening an investigation into Mr. Shea's complaint.

In addition, Ms. Gunter has failed to demonstrate that Drexel took a materially adverse action against her when it "fail[ed] to perform an EIC-1 inquiry" after she told Drexel that she believed Mr. Shea's complaint against her was retaliatory. (ECF No. 83-1 at 28.) Having submitted her own complaint, Ms. Gunter certainly knew how to file one,

and there is no evidence in the record that she made either a formal or informal request for Drexel to investigate her retaliation claim. Likewise, there is no evidence in the record that Drexel somehow prevented her from supplementing her original complaint or filing a new claim of retaliation. Because Ms. Gunter has not come forward with sufficient evidence to support a *prima facie* case of retaliation, Drexel is entitled to summary judgment on these claims as well.

### D.   Punitive Damages

For Title VII and Section 1981 claims, punitive damages "are limited ... to cases in which the employer has engaged in intentional discrimination and has done so 'with malice or with reckless indifference to the federally protected rights of an aggrieved individual.'" *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 529-30 (1999). This is a subjective standard. *See id.* at 536. Thus, to recover punitive damages, a plaintiff alleging intentional employment discrimination must show that her employer "discriminate[d] in the face of a perceived risk that its actions will violate federal law ...." *Id.* Ms. Gunter has not offered any evidence that would permit a reasonable jury to conclude that Drexel acted, or failed to act, with the ***subjective*** belief that it might be violating either Title VII or Section 1981. Absent such evidence, Ms. Gunter cannot prevail on her claim for punitive damages, and Drexel is entitled to summary judgment on this theory of damages.

## IV.    CONCLUSION

A reasonable jury could conclude that members of the IA Department, including

Mr. Shea, subjected Ms. Gunter to a hostile work environment following Ms. Bowman's

first verbal warning to Mr. Shea and that Drexel didn't do enough to stop it. However, her

other claims of employment discrimination fall short, so Drexel is entitled to summary

judgment on them. An appropriate Order follows.

**BY THE COURT:**

*/s/ Joshua D. Wolson*
JOSHUA D. WOLSON, J.

November 5, 2024