IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KIM P. GUNTER, | : | |
|     Plaintiff, | : | Civil Action No.: 2:23-cv-02451-JDW |
| | : | |
| v. | : | |
| | : | |
| DREXEL UNIVERSITY, | : | |
|     Defendant. | : | |

# PLAINTIFF KIM P. GUNTER'S
# PRETRIAL MEMORANDUM

Plaintiff Kim P. Gunter, by and through her unsigned counsel, submits the following pretrial memorandum and accompanying attachments pursuant to this Court's Pretrial Order (ECF No. 92) and Policies and Procedures, Fed.R.Civ.P. 26(a)(3), and Local Rule 16.1.

**FACTUAL SUMMARY OF THE CASE**

This is an employment discrimination lawsuit by a former executive manager, Kim P. Gunter (Gunter), an African American, Black female, against her former employer Defendant Drexel University (Drexel).  Gunter had over 20 years of compliance and privacy professional experience when Drexel hired her, after two national searches lasting nearly two years, as its Vice President and Chief Compliance, Privacy and Internal Audit Officer ("VP CPIA") on July 8, 2019.  In accordance with summary judgment rulings (ECF Nos. 89, 90), Gunter brings this action on her remaining hostile work environment, continuing violations claims under Section 1981 (race and color) and Title VII (race, color and gender) as well as for compensatory damages (emotional distress), lost wages/fringe benefits, attorney's fees, expert fees and costs.

Helen Bowman (Bowman) stated Plaintiff stood out from the other search candidates due to her (Plaintiff's) "exceptionally strong project management and leadership skills, as well as her experience building compliance programs and implementing policies, controls and trainings." Bowman is the Executive Vice President, Treasurer and Chief Operating Officer at Drexel, a Caucasian, White female and Plaintiff's former immediate manager. Unfortunately, Drexel's commitment in providing a work environment that welcomed Plaintiff's "exceptionally strong project management and leadership skills" fell short.  Instead, Bowman and Drexel permitted Bill Shea (Shea), Caucasian, White male, the then-Associate Vice President and Chief Audit Executive and members of Internal Audit team (IA) under Gunter's administrative management to create a hostile work environment for Plaintiff for more than 3 years, beginning with the start of her employment to December 2022 when Drexel removed Shea/IA from Plaintiff's

administrative management.[1] The result of Bowman/Drexel's failure to adequately take remedial action against Shea/IA to prevent the harassment led to Plaintiff being taken out of work for stress, suffering anxiety and other emotional distress diagnoses.

Drexel formed the Office of Compliance, Privacy and Internal Audit (OCPIA) early in 2015, merging Compliance with Internal Audit. Edward Longazel (Longazel), Caucasian, White male gave leadership to the newly formed office becoming its first Vice President and Chief Compliance, Privacy and Internal Audit Officer (VP CPIA). Shea became acting interim head of IA reporting to Longazel, as Shea's administrative manager. According to Longazel, the goal of creating OCPIA was to create synergies in assessing University wide risks that would "help advise the internal audit, audit plan, instead of just a normal audit plan", amongst other things. The Enterprise Risk Management (ERM) committee would be the avenue by which University wide, i.e., enterprise risk would be monitored. General counsel and Bowman chaired ERM with Longazel and Shea tasked with setting the agenda and other administrative functions. OCPIA had one website under Longazel developed with input from Shea. Under Longazel, OCPIA's "synergies" involved Compliance and IA assisting with each other's work. In fact, Longazel gave Shea a written counseling for Shea's behavior of complaining to someone outside of OCPIA. Longazel kept the counseling and facts of the matter within OCPIA. Longazel remained at Drexel as VP CPIA from February 2015 to December 31, 2017, when he retired.

From on or about January 2018 until Plaintiff's hire on July 8, 2019, Bowman assumed interim VP CPIA duties of administrative management of Shea/IA. In this capacity, Bowman had monthly one on one (1:1) meetings with Shea. Operational reporting for Shea remained with

---

[1] Plaintiff avers Shea's harassing conduct continued after December 2022 as noted in her response to Drexel's motion for summary judgment (ECF No. 83-1 at 22) and Motion for Reconsideration (ECF No. 94). She limits her pretrial summation of facts and presentation of evidence based on this Court's rulings but notes her objections. FRCP 46

3

the Chair, Audit Committee (Committee) of the Board of Trustees (Board). At all times relevant to this action, Michael Williams (Williams), Caucasian, White male, was the then-Chair, Audit Committee and Shea's operational manager.

With Plaintiff's hire, Bowman cancelled her July 9, 2019, 1:1 meeting with Shea. Plaintiff then scheduled her initial 1:1 meeting with Shea for July 10, 2019. Plaintiff went about establishing her role as VP CPIA and the office.

In August 2019, then-President John Fry (Fry) scheduled a meeting for October 24 with Bowman and Plaintiff seeking Compliance updates. Also that month, Shea sought to hire an Executive Director for IA. Though he included Plaintiff in emails regarding funding and the position itself, Shea did not include Plaintiff in the interview process when he hired Michael D'Arco (D'Arco), Caucasian, White male, as Executive Director. Plaintiff continued to management/oversight of OCPIA.

In September 2019, IA began an investigation involving ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮ Senior Internal Auditor Raffaele Fusca (Fusca) interviewed ▮▮▮ As a result of this interview, ▮▮▮ reported her displeasure with how the interview was handled to Bowman and summarized the encounter as "**I have never felt as disrespected as that man [Fusca] made me feel today during that interrogation**." (emphasis in original) On the same day, Bowman forwarded the email to Plaintiff and Shea seeking to discuss ▮▮▮ complaint with both at Plaintiff's 1:1 meeting scheduled for the following week. Plaintiff immediately emailed Shea advising him to prepare a statement for them to discuss before meeting with Bowman. Instead, Shea emailed a response to Bowman the same day and *after* Plaintiff's email to him. Bowman later told Plaintiff "Shea doesn't respect women." Plaintiff continued management/oversight of OCPIA.

In October 2019, Shea and Kimberly Gholston, then-Vice President of Human Resources,

4

met with ▮▮▮▮ as a follow up to the September IA interview. During that meeting, Gholston noted "Bill said he reports to the board and administratively to [Plaintiff] because someone has to approve his time." Meanwhile, in preparation for her meeting with Fry and Bowman on October 24, Plaintiff prepared a First 100 Days State of the Office and Three-Year Plan (100 Days Report). After meeting with Fry and Bowman, Plaintiff showed 100 Days Report to Shea, who with D'Arco challenged collaboration wording on one page of the report that Fry, Bowman and Williams had no issues with. At Williams' request, Plaintiff made the changes. Plaintiff presented her report to the Committee at the December 3, 2019 meeting. Shea challenged Plaintiff's edit to the December 3 Committee minutes. Plaintiff continued management/oversight of OCPIA.

On December 19, when Plaintiff notified Shea, she would send out merit letters to the OCPIA team in the new year, Shea questioned the percentage increase and who would send the letters to IA team. Previously on November 1, Plaintiff sent Shea a copy of President Fry's November 1 email about the merit increases, so Shea was already aware of the enterprise merit increases levels. Also, around this time, Plaintiff sought to update and streamline the OCPIA website and create an IA email address. Shea resisted those efforts for weeks before finally coming on board in January 2020. Plaintiff continued management/oversight of OCPIA including hiring new direct reports.

Unbeknownst to Plaintiff, at the March 3, 2020 Committee meeting, during his executive session, Shea mentioned his administrative reporting relationship alleging concerns about IA's independence and "confusion" in the Drexel community about who was "in charge of internal audit." Shea expressed concerns about Plaintiff having 1:1 meetings with Shea/IA and staff meetings including IA, though Shea later admitted in discovery the "confusion" was on his part. Williams and Bowman were surprised by Shea's executive session comments, since Shea never

mentioned his concerns to Bowman or Williams. Williams also noted Shea was being "more aggressive" towards Plaintiff and Shea needed "sensitivity training." Subsequently, in November 2020 Bowman/Drexel changed Plaintiff's job title to exclude IA but did not change the reporting structure, website or other OCPIA enterprise matters. Plaintiff continued management/oversight of OCPIA including training new direct reports.

Things continued to escalate with Shea/IA's behavior towards Plaintiff in April 2020. Finally, on April 16, Plaintiff mentioned her concerns about Shea/IA to Bowman at their 1:1 meeting. On April 27, Bowman, armed with Plaintiff's detailed summary of events, emailed Shea about his questioning Plaintiff "in how I would describe as disrespectful to her being your manager, using your independence as the reasoning." Bowman further noted no one "at Drexel" including the Board, Committee, Fry, Williams and Plaintiff questioned his operational reporting to the Committee and maintaining independence. She admonished Shea to "report respectfully to [Plaintiff]." Finally, Bowman informed Shea her email was a "verbal warning" and if there was no "improvement," she would have to move to "next steps" including documentation. Plaintiff continued management/oversight of OCPIA.

Unfortunately, there was no improvement, and Bowman did not move to any "next steps" or documentation. What did occur after April 27, 2020 through December 6, 2022, was Shea/IA's continued intense conduct towards Plaintiff including, but not limited to, challenges to inclusion of IA in OCPIA monthly newsletter; withdrawing IA team member from ERM minute note taking alleging "confusion"; critiquing ERM presentation materials to remove IA references because "IA department doesn't have anything to do with this committee membership" and from Plaintiff's title; critiquing and demanding changes to Plaintiff's OCPIA Compliance Program draft; challenging Plaintiff's title of an email to D'Arco; sending unsolicited emails to Plaintiff regarding "clean up items" on OCPIA's website, her bio and other matters NOT identified for

change by Fry, Williams, Bowman, Committee, Board or Office of General Counsel (OGC). Regarding the latter incident of Shea behavior, which occurred in June 2022, Bowman told Plaintiff that Plaintiff was "overreacting." Plaintiff continued management/oversight of OCPIA including hiring and termination of team members.

Things came to a head on July 27, 2022, after Plaintiff learned for the first time on July 26, 2022 from then Human Resources Business Partner Xavier Johnson (Johnson) of an incident between D'Arco and Fusca that resulted in an HR investigation. Shea did not tell Plaintiff about the matter, which surprised Johnson. On July 27, Plaintiff met with Shea, who refused to tell Plaintiff any details of the incident. Shea later during discovery included this interaction and others where he characterized Plaintiff as having a "tone" as "events . . . when [Plaintiff] was *trying* to act as my manager." (emphasis added) Plaintiff continued management/oversight of OCPIA.

Thereafter, Plaintiff complained to Bowman and Johnson about Shea/IA's insubordination, microaggressions, hostile and discriminatory behavior. Plaintiff continued to email Bowman and Johnson about Shea/IA's behavior towards her until she was taken out of work by her therapist for work-related stress on August 18.

Once she returned to work on October 25, 2022, Plaintiff again contacted Johnson regarding her complaints. The complaints had not moved forward. Plaintiff sent a detailed email on November 18, 2022 to Johnson outlining Shea/IA's conduct since assuming the role of VP CPIA titled "Bill Shea's Pattern of Harassment and Hostile Work Environment." When she returned on October 25, Plaintiff sent emails to her team including Shea and all of IA informing them of her return and other office matters. Neither Shea nor any member of IA attended a team meeting on October 26 that was scheduled in April 2022. Eventually, on December 6, 2022, Bowman/Drexel removed Shea/IA from administrative reporting to Plaintiff. Johnson finally

sent Plaintiff's complaints about Shea/IA's behavior for third-party investigation in February/March 2023. When asked why it took so long to send Plaintiff's complaints about Shea for investigation, Johnson repeatedly stated "I did not view those allegations [Plaintiff's complaints] as something that could be investigated under our EIC-1 policy." During Plaintiff's administrative management, Shea stated he did not receive any disciplinary actions including written warnings, final warnings, termination or the like.

**PARTIES' RESPECTIVE CLAIMS AND DEFENSES**

Plaintiff's remaining claims for trial are hostile work environment under Section 1981 (race and color) and Title VII (race, color and gender). For her Title VII claims, Plaintiff avers continuing violations doctrine applies to include conduct and behaviors by Shea and IA prior to September 1, 2022 (Title VII 300-day limitation period).

Drexel identified 23 affirmative defenses in its Answer to the Amended Complaint. (ECF No. 16) At this writing it is not clear which of these defenses it intends to present at trial. In prior writings, Drexel sought to characterize Plaintiff's and Shea's relationship as simply two people not getting along and not discrimination.

**LIST OF WITNESSES**

*See* Attachment A to this Pretrial Memorandum for the list of intended witnesses to testify at trial.

**DESIGNATION OF DEPOSITION TESTIMONY**

*See* Attachment B to this Pretrial Memorandum for designations of deposition testimony intended to be offered at trial. Plaintiff further reserves the right to make other designations if notice that other witnesses are unavailable to appear at trial pursuant to Rules of Civil Procedure or Evidence. Plaintiff also reserves the right to use deposition testimony for impeachment purposes and to refresh recollection, in accordance with the Rules of Evidence.

**LIST OF PROPOSED TRIAL EXHIBITS**

*See* Attachment C to this Pretrial Memorandum for the list of proposed trial exhibits intended to be offered at trial. Pursuant to FRCP 26(a)(3), Plaintiff may use other documents and exhibits for impeachment, rebuttal and/or to refresh recollection in accordance with Rules of Evidence. Thus, Plaintiff reserves the right to use all trial exhibits identified by Drexel including, but not limited to, certain sealed documents and former testimony of Drexel witnesses. FRE 804

**STATEMENT OF ANTICIPATED LEGAL ISSUES**

**A. Procure Attendance at Trial of Drexel's Fact Witnesses**

Counsel for Drexel and Plaintiff are working together to secure witnesses' trial attendance. However, there may be a need for Court intervention if efforts fall through due to Board/Committee meetings or other scheduled events that do not constitute unavailability, good cause and/or exceptional circumstances in accordance with Rules of Civil Procedure and Evidence.

**B. Use at Trial of Video Deposition Testimony for Available Witnesses**

During discovery, the Parties engaged in extensive deposition testimony gathering. For two deponents, video and stenographic depositions were taken: Plaintiff and Bowman. Plaintiff anticipates the need for Court intervention to determine the use of video deposition testimony during the bench trial of this matter when there is no agreement between the Parties for use of video depositions and where, barring any events to the contrary, both deponents will be available for live testimony and questioning by the Court.

**C. Privilege Log and Redacted Documents**

On May 17, 2024, in the final days of discovery, Drexel provided its amended privilege log that included text messages between Gholston and Johnson. Drexel identifies four such text

messages dated January 17, 2023. Drexel further contends these texts are subject to work product and attorney client privileges. Plaintiff anticipates the need for Court intervention as she challenges whether the texts are indeed covered by any evidentiary privilege. Also, there are a few exhibits that are redacted but do not appear to comply with this Court's June 28, 2024 order. Plaintiff hopes counsel for the Parties can resolve these issues without Court intervention.

### D. Expert Witness Testimony and Report Admissibility

Plaintiff anticipates challenging the admissibility of Drexel's expert testimony, opinions, and report of Alexis L. Beattie, M.D. FRE 104, 702, 703. Plaintiff reasonably believes Dr. Beattie fails to meet federal qualification, fitness and reliability standards to be presented as an expert in this matter, and that her report and testimony are not relevant, reliable and helpful in assessing Plaintiff's mental health/emotional distress claims.

### E. Calling Trial Witness Not Identified in Rule 26(a)(1) Initial Disclosures

Counsel for Plaintiff and Drexel are once again working to secure the attendance for trial of Drexel witness Raffaele Fusca, Senior Internal Auditor. However, there may be a need for Court intervention if efforts fall through since Fusca was not identified by either party on its Rule 26(a)(1) disclosures.

**ITEMIZMED STATEMENT OF DAMAGES/OTHER RELIEF SOUGHT**

<u>Economic Damages</u>

| **Damages** | **Amount** |
|---|---|
| Lost Compensation[2] | $ 59,394.90 |
| Lost Wages[3] | 189,237.95 |

---

[2] Lost compensation is based on direct compensation, Lincoln Financial Group income and indirect compensation (work life, health and welfare benefits) for the period from August 18, 2022 through October 25, 2022 for leave of absence.

[3] Loss wages are based on Plaintiff's termination on May 13, 2024 and subsequent/current

10


|  |  |
|---|---|
| **TOTAL** | **$248,632.85** |

<u>Non-Economic Damages</u>

Emotional Distress          to be determined by factfinder

**PROPOSED TIME LIMITS**

During the November 21, 2024 pretrial conference, the Court outlined its bench trial practices including, but not limited to, short opening statements and no closing statements at the end of the trial but return on subsequent listing, amongst other things. Plaintiff supports imposition of time limits on opening and closing statements: 15 – 20 minutes for each sides' openings and 30 minutes for each side's closing statements.

The imposition for trial presentation is a bit harder to determine at this time since the Parties continue to try to determine a new trial date(s), i.e., staggered dates based primarily on Drexel's counsel/witnesses' and medical witnesses' availability. Plaintiff reserves the right to supplement this section once these open issues are resolved. Counsel scheduled a meet and confer for March 24, 2025.

Plaintiff reserves the right to supplement and/or amend her pretrial memorandum.

                                                                                  **Respectfully submitted,**

<u>/s/ Karin M. Gunter</u>
Karin M. Gunter, Esquire
PA ID No.: 79852
Law Office of Karin M. Gunter
85 Old Cedarbrook Road
Wyncote, PA 19095
Telephone: (215) 548-9992
Facsimile: (215) 548-7277
Date: March 21, 2025                             Counsel for Plaintiff, Kim P. Gunter

---

mitigation of damages for unemployment compensation and graduate assistant employment: $140,159.45 (2024) and $ 49,078.50 (2025) as of March 31, 2025. Plaintiff's income at time of termination was $267,750.