## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **KIM GUNTER**, | |
| *Plaintiff,* | **Case No. 2:23-cv-02451-JDW** |
| v. | |
| **DREXEL UNIVERSITY**, | |
| *Defendant.* | |

## <u>MEMORANDUM</u>

Our country's anti-discrimination laws instruct employers not to view their employees solely as members of a protected class. Instead, they have to consider the person as an individual, with all the individual quirks that each of us has. The converse is also true: employees cannot view their relationships in the workplace solely based on their membership in protected classes. Instead, like their employers, they have to see everyone holistically, shaped by factors like personality, managerial style, diligence, and all the other things that play into workplace relationships. It's hard, but an employee must do that even for herself as she conceives of her own place in the workplace.

The three-day bench trial in this case makes clear to me that Kim Gunter didn't do that. During her time at Drexel University, she viewed everything through the prism of her status as a Black, African American woman who happened to replace a White man. And she assumed that other employees did the same. So, when one of her direct reports

treated her differently than how he had treated his former boss, Ms. Gunter concluded that he was intentionally discriminating against her. And that led her to take every negative workplace interaction as discriminatory, contributing to her perception of a hostile work environment. But the evidence presented at trial does not support that narrative. Nor was the alleged discrimination severe or pervasive. While the mistreatment detrimentally affected Ms. Gunter, it would not have done so to a reasonable employee in similar circumstances. Thus, I will enter judgment in favor of Drexel on Ms. Gunter's remaining claims for a hostile work environment.

## I.     FINDINGS OF FACT

### A.     Internal Audit Under Mr. Longazel

1.     In 2014, Drexel University's Audit Committee approved a proposal to combine Drexel's Compliance and Privacy Office with its Internal Audit Office. Because both offices are on "the front line of defense" when it comes to protecting the university from risk, the Audit Committee thought Drexel could achieve synergies from having both departments under a single Vice President. (Tr. Day 1, 58:14 – 59:2.)[1] The two offices combined into the Office of Compliance, Privacy and Internal Audit ("OCPIA").

2.     At the time of the merger, Bill Shea was the Associate Vice President of Internal Audit, Chief Audit Executive who ran Internal Audit ("IA"). Edward Longazel (a

---

[1]     All references to "Tr." refer to the trial transcript at ECF Nos. 134-36. Day 1 was Sept. 8, 2025, Day 2 was Sept. 9, 2025, and Day 3 was Sept. 10, 2025.

White man) ran the Compliance and Privacy Office. However, once the two offices combined, Mr. Longazel became Vice President and Chief Compliance Privacy and Internal Audit Officer. He was the first person to hold this title at Drexel.

3.       As part of his new role, Mr. Longazel assumed administrative management over Mr. Shea and IA. His administrative oversight included tasks such as reviewing and approving time sheets and expense reports, approving Mr. Shea's vacation, reviewing and assisting with budgets, and conducting performance evaluations for Mr. Shea. However, Mr. Longazel did not involve himself in any of IA's day-to-day operations or communicate with individual staff members. Even his interactions with Mr. Shea were very limited.

4.       In terms of IA's operations, Mr. Shea reported to the Audit Committee. At all relevant times, Mike Williams was the Chair of Drexel's Audit Committee. One of the Audit Committee's duties was to ensure Mr. Shea's functional independence as the Chief Audit Executive.

5.       Compliance and internal audit are different disciplines. At a basic level, compliance officers make sure an entity, like a university, is following its various regulatory responsibilities. Internal audit officers, on the other hand, review controls that are in place regarding the entity's financial line.

6.       Independence is "one of the pillars" of the internal audit profession. (Tr. Day 1, 128:18-19.) And Mr. Shea was very serious about maintaining both actual independence and the appearance of independence during his time as Drexel's Chief Audit Executive. To

that end, he would raise concerns about independence "at any point that it presented to him, such as if he felt that something was not being openly investigated or audited" or if someone was preventing him or his staff from having full access. (Tr. Day 1, 233:17-21.) Mr. Shea was an "intense" individual who was "very passionate" about the internal audit profession, including the maintenance of auditors' independence. (*Id.* at 128:11-12; 238:21; 233:14-15; *see also* Tr. Day 2, 91:1-2.)

7.     When Compliance and IA merged, Mr. Shea was concerned about his independence. As a result, Mr. Longazel and Mr. Shea "did a fair amount of wordsmithing for the website pages and the announcements of how the departments were related and now being coordinated by one vice president." (Tr. Day 1, 219:5-8.)

8.     Mr. Longazel exercised minimal oversight of IA. He handled a limited universe of administrative tasks, while Mr. Shea managed IA's day-to-day operations, including its audit activities. Given this structure, there was very little interaction between Mr. Longazel and Mr. Shea. Indeed, most of their contact occurred during quarterly one-on-one meetings in advance of upcoming Audit Committee meetings. During those meetings, Mr. Shea would advise Mr. Longazel about what audits his office was working on, but they never discussed how Mr. Shea was conducting them.

9.     As part of "staying in [his] lane," Mr. Longazel had almost no interaction with individual members of Mr. Shea's staff. (*Id.* at 234:23.) He did not have individual meetings with them. He did not have team meetings with them. He did not evaluate their

4

performance. They did not report to him in any way, and he was not responsible for their activities. Along the same lines, Mr. Longazel "never knew who [Mr. Shea] was interviewing and [he] never knew who [Mr. Shea] was hiring" because "[t]hey were [Mr. Shea's] people." (Tr. Day 1, 236:7-10.) In fact, Mr. Longazel didn't expect Mr. Shea to include him in IA's hiring process "because of the nature of the office and separation of duties." (*Id.* at 236:11-18.)

10.     However, there were instances when Mr. Shea's and Mr. Longazel's respective offices shared resources. For example, if Mr. Shea needed assistance from someone in Compliance and Privacy, he'd ask Mr. Longazel if someone from his office could help. And if Mr. Longazel needed expertise from an accountant, he'd ask Mr. Shea if someone from IA could pitch in.

11.     In addition, Mr. Shea and Mr. Longazel staffed Drexel's Enterprise Risk Management Committee ("ERM"). Mr. Shea's office took the minutes at those meetings, and he never stopped his staff from working with ERM. He also never complained about IA's involvement with the committee. On the contrary, "[h]e was excited about ERM" because it was another way to identify risk at Drexel. (*Id.* at 244:15.)

12.     During their professional relationship, there was one instance in which Mr. Shea complained about Mr. Longazel interfering with his independence. A serious issue arose while Mr. Shea was out on vacation. Given the severity of the incident, Mr. Longazel stepped in and reported the incident to senior management on IA's behalf. When Mr.

Shea returned from vacation and learned about what happened, he complained to another Drexel employee about Mr. Longazel's actions. Mr. Shea did not complain to Mr. Longazel or any other member of senior management about Mr. Longazel's conduct.

13. Mr. Longazel left Drexel in 2018. While Drexel searched for his replacement, the Executive Vice President, Treasurer and Chief Operating Officer, Helen Y. Bowman (a White woman), took over as Mr. Shea's administrative manager. She served in that role on an interim basis from January 1, 2018, until July 7, 2019, and then again from December 6, 2022, to July 7, 2024.

14. While Ms. Bowman served as Mr. Shea's administrative manager, he "mentioned independence issues" with her. (Tr. Day 1, 277:15-16.) Ms. Bowman learned more about internal audit as a profession and "how dedicated they were" to independence. (*Id.* at 16-18.)

**B.    Internal Audit Under Ms. Gunter**

15. On July 8, 2019, Ms. Gunter took over as Vice President, Chief Compliance, Privacy and Internal Audit Officer at Drexel. Ms. Gunter served on the President's Cabinet and Executive Council, and she reported to Ms. Bowman.

16. As VP, Chief Compliance, Privacy and Internal Audit Officer—and consistent with the structure of the role when Mr. Longazel and Ms. Bowman held it—Ms. Gunter served as Mr. Shea's administrative manager. However, the Audit Committee continued to exercise operational oversight over Mr. Shea and his department.

17.     Ms. Gunter took a much more involved approach to being Mr. Shea's administrative supervisor than Mr. Longazel had. Indeed, the witnesses who had first-hand knowledge of both Mr. Longazel's and Ms. Gunter's respective management styles testified that they were "very different." (Tr. Day 1, 32:12-13.) Mr. Longazel gave Mr. Shea "the autonomy to go run internal audit," whereas "Ms. Gunter was wanting to be much more actively involved in the activities of [Mr. Shea's] department." (*Id.* at 32:12-16.) Other witnesses echoed this sentiment, with Ms. Bowman describing Mr. Longazel "as an individual that didn't manage very much." (Tr. Day 2, 100:9-10; *see also* Tr. Day 1, 101:8-10.) Even Mr. Longazel characterized his own style as "staying in [his] lane" (Tr. Day 1, 234:23.) He focused on his responsibilities in Compliance and Privacy, and he let Mr. Shea "handle internal audit activities" as he saw fit. (*Id.* at 245:1-5.) As such, Mr. Shea "didn't have much interaction" with Mr. Longazel, who he described as "ready for retirement." (Shea Dep.[2] 159:19-21.[3])

18.     Shortly after arriving at Drexel, Ms. Gunter started to feel that Mr. Shea was disrespecting her and her administrative authority over him. In August 2019, Mr. Shea did not include Ms. Gunter when he interviewed Michael D'Arco to be the Executive Director of IA. Though Mr. Shea reached out to Ms. Gunter about a budget for the position, he did

---

[2]     Mr. Shea did not testify at trial because he died while this case was pending. Therefore, the only testimony from him in the record is portions of his deposition.

[3]     Although Ms. Gunter did not have first-hand knowledge of Mr. Longazel's management style, multiple people at Drexel told her that Mr. Longazel "was not involved at all." (Tr. Day 2, 156:1-2.)

not tell her how interviews were going, did not include her in any interviews, and did not tell her when he decided to hire Mr. D'Arco. Though he did not keep her updated on his own, Mr. Shea provided updates to Ms. Gunter when she asked him about the status of hiring. (*See* Tr. Day 2, 226:5-25.) Ms. Gunter viewed Mr. Shea's failure to include her in the hiring process as a "total disregard" of her as his administrative supervisor and "disrespectful" by not introducing her to someone who would be working in the same office suite. (*Id.* at 209:14-16; 233:8 – 234:7.) She contends that this is the first instance of Mr. Shea's discriminatory and harassing behavior.

19.     The following month, a Dean at Drexel emailed a complaint to Ms. Bowman about the way a member of IA had questioned her about certain expenses. At 12:11pm on September 27, 2019, Ms. Bowman wrote to Mr. Shea and Ms. Gunter and said she wanted to discuss the Dean's complaint during her upcoming one-on-one meeting with Ms. Gunter. Four minutes later, Ms. Gunter asked Mr. Shea to discuss the incident with her before they met with Ms. Bowman. At 1:36pm, however, Mr. Shea responded directly to Ms. Bowman before speaking with Ms. Gunter. (*See* Exs. 61, 62.[4]) Ms. Gunter contends that this is an example of Mr. Shea ignoring her directives and disregarding her as his administrative supervisor. However, there is no evidence that Mr. Shea saw Ms. Gunter's email before he responded to Ms. Bowman. Without more, I will not infer that Mr. Shea made a conscious decision to ignore Ms. Gunter's request in this instance.

---

[4]     All references to "Ex." refer to the exhibits I admitted during trial.

20.     Ms. Gunter believes that Mr. Shea ignored her directive and was "surprised" that he responded to Ms. Bowman without speaking with her first. (Tr. Day 2, 134:23.) Ms. Gunter told Ms. Bowman about Mr. Shea's failure to follow her instructions. In response, Ms. Bowman told Ms. Gunter that Mr. Shea "doesn't respect women" and advised her that she had her hands full with him. (*Id. at* 136:14-16.) Ms. Bowman testified that she has "zero recollection" of making those comments to Ms. Gunter and that she never felt that Mr. Shea did not respect women.[5] (Tr. Day 3, 127:12-16.)

21.     Later, Mr. Shea and Kimberly Gholston, Vice President of Human Resources and Chief Diversity Officer, met with the Dean who had complained to Ms. Bowman about IA. In providing a summary of the meeting to Ms. Bowman, Ms. Gholston noted that Mr. Shea "said he reports to the board and administratively to Kim [Gunter] because someone has to approve his time." (Ex. 66 at DREXEL GUNTER_1087.) Though Mr. Shea did not recall making the exact statement about needing someone to approve his time, Ms. Gholston's testimony was credible, and her contemporaneous notes are additional evidence that Mr. Shea made a comment along these lines.[6] Ms. Gunter was not at the meeting to hear the

---

[5]     I find Ms. Gunter's testimony more credible about whether Ms. Bowman made this statement. However, I also find Ms. Bowman's disavowal of the statement credible, including her testimony that she "never" reached a conclusion that Mr. Shea did not respect women. (Tr. Day 3, 127:16.) The record is unclear why Ms. Bowman made the comment about Mr. Shea if she didn't think he had a lack of respect for women, but that appears to be what happened.

[6]     Ms. Gholston testified that her notes were simply a paraphrase of Mr. Shea's comments, not a direct quote.

comment firsthand, though Ms. Bowman forwarded her Ms. Gholston's summary of what transpired, including Mr. Shea's comment. Ms. Gunter contends that this statement was discriminatory and harassing.

22.     After her arrival at Drexel, Ms. Gunter also tried to include Mr. Shea in the process of revising OCPIA's website. When Ms. Gunter talked to Mr. Shea about changes to streamline the site, he "pushed back" and said they didn't need to change it. (Tr. Day 2, 165:6-22.) "He just refused" to work with Ms. Gunter on the website at all, which embarrassed her. (Tr. Day 3, 26:16; *see* Tr. Day 2, 165:23 – 166:4.) However, Mr. Shea did provide some feedback regarding updates to the site, and Ms. Gunter noted that he eventually agreed to some changes after "several weeks". (*See* Exs. 72, 170 at DREXEL_GUNTER_346.)

23.     In January 2020, Ms. Gunter asked IT to create new mailboxes for the individual offices under her purview, including Compliance, Privacy, and IA. Mr. Shea did not want a new mailbox because he believed that people at Drexel knew how to contact IA without it. Ms. Gunter contends that Mr. Shea's resistance to working with her to update the OCPIA website and creating a new mailbox for IA was discriminatory and harassing.

24.     When Drexel hired Ms. Gunter, the Audit Committee asked her to put together a report detailing her initial observations and assessment of the departments that fell within her purview, including IA. Ms. Gunter shared her First 100 Days State of the Office Report and Three-Year Plan (the "100-Day Report") with Mr. Shea before submitting

it to the Audit Committee or Mr. Williams. Mr. Shea and Mr. D'Arco reviewed it and told Ms. Gunter that she "should not mention Internal Audit" and that she "needed to take [IA] out of the report." (Tr. Day 2, 173:14 – 174:2.) Ms. Gunter disagreed and raised the issue on a call with Mr. Shea and Mr. Williams. Mr. Shea expressed concern that the mention and assessment of IA in the Report could make it appear that Ms. Gunter was directing audits. Though Mr. Williams did not share this concern, he asked Ms. Gunter to make clear in the report that she merely had administrative oversight over IA, as opposed to operational oversight. Ms. Gunter made that change, and she also obliged Mr. Shea's request to remove a proposal for Compliance to review or change policies following audits. Ms. Gunter believes that Mr. Shea's (and Mr. D'Arco's) complaints about the 100-Day Report were discriminatory and harassing.

26. Though he did not express this concern with Mr. Williams, Mr. Shea also objected to Ms. Gunter's inclusion of IA in the 100-Day Report because "[s]he wrote in there that Internal Audit was continuing to do audits and all these great things we're doing. She wasn't tasked for that. That wasn't her achievement. That was my achievement." (Shea Dep. 188:20-24.)

26. In December 2019, Ms. Gunter seemingly stepped on Mr. Shea's toes when she sent out letters to his staff, advising them of their merit increases for the next year. Upon receiving his own merit increase, Mr. Shea inquired: "[W]hat happened to the letters

for my staff? Shouldn't I be sending them prior to the Holiday as I have always done?" (Ex. 74 at KPG 798.) Ms. Gunter views Mr. Shea's inquiry as discriminatory and harassing.

27.     In turn, Mr. Shea felt "confused" about who was "ultimately responsible" for IA and wanted to know whether he was still "in charge of Internal Audit." (Shea Dep. 186:23 – 187:8.) He testified that his team expressed confusion as well. Mr. Shea raised the issue of confusion during the executive session of an Audit Committee meeting on March 3, 2020. He said that having "internal audit" in Ms. Gunter's title created confusion among Drexel management about "who was running" the department. (Tr. Day 1, 42:11-13.) Yet he did not identify any members of Drexel management who were confused as to who was running the day-to-day operations of IA.

28.     When he raised the issue of confusion during the Audit Committee, Mr. Shea did not request that Ms. Gunter's title be changed. However, following that incident, Ms. Bowman asked Human Resources to do a survey of Ms. Gunter's position at other universities with similar reporting structures to see what those titles were.

29.     During the same meeting, Mr. Shea also voiced "concerns about the independence of his function and Ms. Gunter's involvement in this area." (Tr. Day 1, 40:4-6.) Specifically, he complained that she "was getting more involved in the activities of the internal audit department than he deemed appropriate." (Tr. Day 1, 40:22-24.) For example, "his complaints involved the violation of what he felt was independence issues

as a result of her having one-on-ones, newsletters, and other things that were not under Mr. Ed Longazel." (*Id.* at 252:1-4.)

30.     The Audit Committee, including Mr. Williams, thought that Ms. Gunter's activity was appropriate and that she did not intrude on Mr. Shea's or IA's independence. Ms. Bowman agreed. And Mr. Williams and Ms. Bowman advised Mr. Shea on more than one occasion that Ms. Gunter's administrative initiatives—while different from Mr. Longazel's—did not impair IA's independence.

31.     Following the Audit Committee meeting, Mr. Williams discussed Mr. Shea's comments with Ms. Bowman, and both of them were surprised and disappointed that he had raised the issue without giving Mr. Williams a heads-up. They also discussed how the parties' respective titles and reporting structure were the same as they had been when Mr. Longazel was at Drexel. So, they found it "odd" that Mr. Shea was "making it such an issue now." (Ex. 2 at DREXEL_GUNTER_9937.) They also talked about how Mr. Shea's attitude had "totally changed" and how he was "acting like the gotcha police[.]" (*Id.*)

32.     Around the same time, the Covid-19 pandemic was raging, and Drexel closed offices to manage the spread of the virus. Ms. Gunter sent a text to the various members of her team, including Mr. Shea, advising them to retrieve whatever items they needed from their offices in advance of the closure. Mr. Shea responded: "Why are you sending this text[?]" (Ex. 3.) Ms. Gunter views this curt response as discriminatory and harassing.

33.    Ms. Gunter also suggested that Mr. Shea should be her proxy if she contracted Covid-19, and he said that he could not serve as her backup because he didn't handle compliance. Instead, he suggested that someone in the Compliance group should be Ms. Gunter's number two in the event she was unavailable. Ms. Gunter contends that Mr. Shea's refusal to agree to be her backup was discriminatory and harassing.

34.    While the office was closed, Ms. Gunter created a virtual leadership meeting with her direct reports. Mr. Shea told Ms. Gunter to include Mr. D'Arco because he was a leader in IA, even though the meeting was just for Ms. Gunter's direct subordinates. Ms. Gunter contends that Mr. Shea's inclusion of (or attempt to include) Mr. D'Arco in the meeting was discriminatory and harassing.

35.    Later, Ms. Gunter announced during a team meeting that OCPIA would be moving to another building. On a separate call with just the leadership team, Mr. Shea asked that Ms. Gunter share any upcoming announcements with him before making an announcement to members of IA. During the leadership call, Mr. Shea continued to ask that Ms. Gunter "clear" any further announcements about the move with him first. (Ex. 85 at KPG 143.) He also told Ms. Gunter that he was not trying to argue with her on the issue. Ms. Gunter contends that Mr. Shea's repeated request that she run things by him before making announcements to his staff and his characterization of her as "arguing" with him are each discriminatory and harassing.

36.     In April 2020, Megan Weyler, Senior Vice President and Chief Human Resources Officer, sent a draft Protection Of Minors policy to Ms. Gunter and wanted Mr. Shea to review it. When Ms. Gunter forwarded the policy to Mr. Shea for his review, he wrote back: "Kim, Why is this coming from you and not Megan?" (Ex. 83 at KPG 130.) After Mr. Shea sent this email, Ms. Gunter texted Ms. Weyler about his response. Ms. Weyler said that she wanted to respond to Mr. Shea's email but couldn't do so without calling him a jackass. (Ex. 137 at KPG 2263.) Ms. Gunter replied that another member of IA (Mr. D'Arco) was starting to "mirror" Mr. Shea's behavior towards her. (*Id.* at KPG 2264.)

37.     For his part, Mr. Shea felt that Ms. Gunter should have advised Ms. Weyler to re-direct her request to him, since he had been working with Ms. Weyler on the policy. (*See* Shea Dep. 142:15-23; 144:1-10.) In his view, Ms. Weyler sending the policy to Ms. Gunter and asking her to direct Mr. Shea to review it gave the appearance that Ms. Gunter had control or influence over IA. (*Id.* at 148:1-11.) Ultimately, however, Mr. Shea reviewed the policy and responded to Ms. Weyler directly, as Ms. Gunter directed him to do. (*See* Ex. 83 at KPG 131.) Ms. Gunter contends that Mr. Shea's behavior in this incident was discriminatory and harassing.

38.     Following these incidents, Ms. Gunter raised Mr. Shea's behavior towards her during a one-on-one meeting with Ms. Bowman on April 16, 2020. She followed up with an email to Ms. Bowman on April 22, 2020, detailing additional incidents in which Mr. Shea resisted or challenged her oversight of the IA department. In her email, she

reported that Mr. Shea "does not think that I should provide any substantive management of Internal Audit, or that Internal Audit should participate fully in Office leadership." (Ex. 85 at KPG 142.)

39.    On April 27, 2020, Ms. Bowman wrote to Mr. Shea and issued him a "verbal warning" for questioning Ms. Gunter in a way that was "disrespectful to her being [his] manager, using [his] independence as the reasoning." (Ex. 4 at DREXEL_GUNTER_2776.) Ms. Bowman noted that the reporting relationship with Ms. Gunter was "no different than when [Mr. Longazel] was here, but [Mr. Shea] seem[ed] to have [an] issue now." (*Id.*) She also advised Mr. Shea that Ms. Gunter's more hands-on administrative style did not compromise IA's independence.

40.    Despite the verbal warning from Ms. Bowman, Mr. Shea continued to resist Ms. Gunter's efforts to exert any supervisory authority over him or his department. After she arrived at Drexel, Ms. Gunter created a newsletter for OCPIA. In June and July 2020, however, Mr. Shea and Mr. D'Arco challenged Ms. Gunter's inclusion of IA in that newsletter. And when they provided articles for the newsletter, the article content did not align with the vision that Ms. Gunter communicated. (*See* Ex. 18 at KPG 11.) Ms. Gunter views this behavior as discriminatory and harassing.

41.    In September 2020, Ms. Gunter provided edits to the Audit Committee meeting minutes, but she contends that Mr. Shea and Mr. D'Arco did not incorporate them. When Ms. Gunter asked about her edits, Mr. Shea pointed out that she had made

typographical errors that they corrected. (*See* Ex. 18 at KPG 11.) Ms. Gunter contends that this conduct was discriminatory and harassing.

42.    That same month, Mr. Shea wrote to Ms. Gunter that it was his understanding that since she had become fully staffed, Raffaele Fusca from IA would no longer be taking the minutes at ERM meetings. Ms. Gunter advised Mr. Shea that Mr. Fusca was meant to continue taking the minutes at the ERM meetings, but she also indicated that if Mr. Shea did not want him to continue doing so, it was "no problem." (Ex. 91 at KPG 765.) Months later, Mr. Shea asked Ms. Gunter to remove a reference to IA in a slide deck for the ERM meeting because his view was that IA did not have anything to do with committee membership. (*See* Ex. 18 at KPG 12.) Ms. Gunter contends that Mr. Shea's distancing from working on ERM was discriminatory and harassing.

43.    By late October 2020, Ms. Bowman reported to Mr. Williams and then-President John Fry that most of Drexel's peer universities had IA reporting to someone in Ms. Bowman's position for administrative purposes, rather than to the Chief Compliance Officer. However, Ms. Bowman and Mr. Williams both preferred to keep IA's reporting structure as it was, to take advantage of synergies between the two departments. While Ms. Bowman noted that Ms. Gunter had not interfered with IA's independence, she was willing to drop IA from Ms. Gunter's title to avoid the appearance of any intrusion on the department's independence. (*See* Ex. 5.)

44.     Ms. Bowman advised Ms. Gunter that she was considering changing her title and asked Ms. Gunter which title she preferred. Then, on November 19, 2020, Ms. Bowman notified Mr. Shea that going forward, Ms. Gunter's title would be Vice President and University Chief Compliance and Privacy Officer. In doing so, she noted that Mr. Shea had "expressed concern about [Ms. Gunter's] title" and her involvement with IA, and it "would provide more clarity of independence to the campus community if Internal Audit was not part of her title." (Ex. 7 at DREXEL_GUNTER_103.) At the same time, however, there was no corresponding change to the name of OCPIA, and Ms. Bowman made clear that there would be no change to the website or reporting structure. In other words, Ms. Gunter would continue to serve as Mr. Shea's administrative manager, and she could continue to have one-on-one meetings with him and any members of IA as she deemed necessary. The change in title did not change Ms. Gunter's responsibilities, and there was no reduction to her salary or budget.

45.     At a virtual diversity training session in December 2020, Ms. Gunter shared during the meeting that she felt that she had been treated differently as "a black woman coming in after a white man had the position." (Tr. Day 2, 141:11-13.) This was the first time that Ms. Gunter put Drexel management—specifically, Ms. Bowman—on notice that she felt that she was experiencing discrimination, though she did not identify Mr. Shea as

the source.[7] Ms. Bowman did not report the issue to HR or take any specific action to address Ms. Gunter's concerns.

46.    In January 2021, Mr. Shea was reviewing the ERM meeting minutes and advised Ms. Gunter that her title in a slide deck presentation was still listed as VP, Compliance, Privacy and Internal Audit. He opined that her title "should be updated" to reflect the recent change. (Ex. 18 at KPG 12.) Ms. Gunter contends that this comment from Mr. Shea was discriminatory and harassing.

47.    Months later, in July 2021, Ms. Gunter shared an initial draft of the Drexel Compliance Plan which included a summary of Drexel's audit function and a high-level description of IA. Ms. Gunter contends that Mr. Shea "scoffed" at the references to IA in the draft, so Ms. Gunter removed them. (Ex. 18 at KPG 13.) He also told her that he shouldn't be a member of the Compliance Committee but would participate because Mr. Williams told him to do so. (*Id.*)

48.    That same month, Ms. Gunter scheduled a virtual meeting with the entire team to introduce OCPIA to their new Human Resources Business Partner, Xavier Johnson.

---

[7]    Ms. Bowman was present at the meeting and was surprised by the comment. She claims that she did not interpret Ms. Gunter's comment to be referring to discrimination, but I don't find her testimony to be credible on that score. *First*, Ms. Gunter made her comment in the context of a diversity training session dealing with inclusion and belonging. *Second*, Ms. Bowman admits that Ms. Gunter said she felt "different **as an African-American woman** ...." (Tr. Day 2, 55:20-21 (emphasis added).) *Third*, after Ms. Gunter shared her feelings, Ms. Bowman "immediately said[:] I'm sorry you felt that way." (*Id.* at 57:24-25.)

In her email scheduling the meeting, Ms. Gunter asked everyone to turn their cameras on so that Mr. Johnson could see them and put a face to a name. During that meeting, Mr. D'Arco did not put his camera on. Mr. Shea "never spoke up to correct or address" Mr. D'Arco's failure to turn on his camera during the meeting. (Ex. 18 at KPG 13.) Mr. D'Arco testified that there were many meetings during which he did not turn on his camera because the feed would get very choppy when he was working from home during the pandemic, as many other people were using internet in his building. I found Mr. D'Arco's testimony on this issue to be credible. Ms. Gunter contends that Mr. D'Arco's failure to follow her directive and Mr. Shea's failure to address his insubordination are discriminatory and harassing behavior.

49.    On September 29, 2021, during an OCPIA team meeting, Mr. D'Arco told Ms. Gunter that his hand was cramping from taking notes and trying to keep up with her presentation during the meeting. He told her that in future meetings, she should have an agenda to avoid that problem. (*See* Ex. 9 at KPG 72.) According to Ms. Gunter, Mr. Shea "did not speak up or address [Mr. D'Arco's] inappropriate, disrespect for me, and disruption of the team call." (*Id.*) Ms. Gunter views Mr. D'Arco's behavior on the call and Mr. Shea's failure to address it as discriminatory and harassing.

50.    The next day, Ms. Gunter's assistant emailed Mr. D'Arco about a time change to his previously scheduled one-on-one meeting with Ms. Gunter.  Mr. D'Arco asked if the meeting title could be changed to a Wellness Check-In, despite the fact that Ms. Gunter

had been having one-on-one meetings with members of IA since she arrived at Drexel. When Ms. Gunter denied his request, Mr. D'Arco copied his immediate supervisor—Mr. Shea—and asked: "I want to confirm you are telling me I have no choice?" (Ex. 8 at KPG 69.) At that point, Ms. Bowman chimed-in and noted that she would be setting up a meeting with HR and IA "to discuss issues that have occurred since [Ms. Gunter's] arrival that I view as unnecessary." (*Id.* at KPG 68.) She also called on Mr. Shea to ensure his staff's participation in the meetings and to lead in this regard. Ms. Bowman viewed Mr. D'Arco's email exchange with Ms. Gunter as antagonistic. (*See* Tr. Day 2, 62:22 – 64:21.) Ms. Gunter contends that it was discriminatory and harassing.

51.     In January 2022, IA audited Ms. Gunter's office. She contends that the two auditors did not understand her office's structures and processes, and she had to follow-up with IA to clarify portions of the audit report that did not make sense based on her office's functions. After the final audit report came out in June 2022, Mr. Shea contacted Ms. Gunter about fraud cases that had been reported and closed, but that IA had not reviewed, even though Ms. Gunter had similar discussions with Mr. Shea's auditors during the audit. (*See* Ex. 18 at KPG 13, 14.) Mr. Shea recused himself from the audit, but Ms. Gunter contends that the errors in the report (as opposed to the audit itself) and Mr. Shea's email about matters that Ms. Gunter had already addressed are evidence of discrimination and harassment.

52.    In April 2022, OCPIA moved offices again. From the start, Mr. Shea asked that IA move separate from the rest of the office. Ms. Gunter denied that request, and once they all received their new location, Mr. Shea and Mr. D'Arco started dealing with the Real Estate department directly until Ms. Gunter advised that she was the point person for the move. (*See* Ex. 18 at KPG 13.) Ms. Gunter views Mr. Shea's and Mr. D'Arco's attempts to bypass her as discriminatory and harassing.

53.    On June 3, 2022, Mr. Shea sent Ms. Gunter an email entitled "Clean Up Items Identified." (Ex. 10 at KPG 1093.) Mr. Shea identified various places—such as Ms. Gunter's bio on the website, internal policies, and the OCPIA newsletter—where he believed Ms. Gunter's title or the function of OCPIA or Compliance needed to be "modified to reflect a more specific/detailed read to the Drexel community." (*Id.*) Mr. Shea expressed concern that someone could read these items as indicating that Ms. Gunter "lead[s] and [is] in charge of the Internal Audit function." (*Id.* at KPG 1092.) However, he admitted that no one told him to look at these various items or identify items for Ms. Gunter to "clean up." (*See* Shea Dep. 166:23 – 167:13.) This was something he did on his own.

54.    When Ms. Gunter asked Mr. Shea why he didn't raise these concerns when they were in the office together the day prior, he replied that he was "simply asking not arguing." (Ex. 10 at KPG 1092.) Ms. Gunter contends that Mr. Shea's comment about "not arguing" with her and his unprompted identification of "clean up items" reflects discriminatory and harassing behavior.

55.     Things came to a head on July 27, 2022. The day prior, Mr. Johnson asked Ms. Gunter if Mr. Shea had told her about an HR investigation into an incident that occurred between Mr. D'Arco and Mr. Fusca during an IA meeting in June. Mr. Shea had not told Ms. Gunter anything about the investigation or the underlying incident. Ms. Gunter shared this information with Ms. Bowman, who was also unaware. Mr. Johnson had instructed everyone he interviewed (including Mr. Shea) that the investigation was confidential and that they should not discuss it with anyone. Yet when he told Ms. Gunter about the investigation, he said he was surprised that Mr. Shea did not tell her about it. (Ex. 102 at KPG 1014.)

56.     When Ms. Gunter spoke with Mr. Shea on July 27, 2022, and asked him about the investigation and the underlying incident, he refused to tell her anything about what happened. Even though Mr. Johnson had told Ms. Gunter about the investigation himself, Mr. Shea refused to tell her anything about it until he cleared it with Mr. Johnson, citing Mr. Johnson's prior instructions. Ms. Gunter reminded Mr. Shea about her role as his administrative manager, but he continued to refuse to give her the information she sought. Instead, he directed her to speak with Mr. Johnson if she wanted more details. The conversation escalated, with both individuals talking over one another. At one point, Mr. Shea said he was "not arguing" with Ms. Gunter, which prompted her to ask why he used the term "arguing." (Ex. 102 at KPG 1014-1015.) Mr. Shea responded that he mentioned arguing because of Ms. Gunter's "tone." (*Id.* at KPG 1015.)

57.     After the call, Ms. Gunter wrote to Mr. Johnson and explained that her call with Mr. Shea "was the most recent episode of insubordination and discrimination" and that it had "become a hostile work environment" for her. (Ex. 102 at KPG 1013.) Ms. Gunter had a virtual meeting with Ms. Bowman and Mr. Johnson on August 2, 2022, during which Ms. Gunter reiterated Mr. Shea's "disrespect, microaggressive actions and statements" towards her. (Ex. 104 at KPG 1061.) During the meeting, Ms. Bowman opined that Ms. Gunter "should not have to continue to deal with the stress of this relationship and has been doing so since she got here." (*Id.*) Days later, Ms. Gunter met with Mr. Johnson again to outline all the issues she had with Mr. Shea and to go over the various incidents of alleged discrimination and harassment.

58.     On August 19, 2022, Ms. Gunter took a leave of absence due to stress. She returned on October 25, 2022. Several months prior, Ms. Gunter had scheduled monthly virtual meetings with the entire OCPIA team. A meeting was scheduled for October 26, 2022, the day after Ms. Gunter returned. Mr. Shea knew that Ms. Gunter was back in the office, yet neither he nor anyone else from IA attended the meeting. When Ms. Gunter confronted him about it, Mr. Shea explained that while Ms. Gunter was on leave, an audit client scheduled a walkthrough meeting with the entire IA team, and the team accepted the invitation because Ms. Gunter had not been holding meetings while she was out on leave. He notified Ms. Gunter's executive assistant on two occasions that IA would not be attending the meeting, and it appears that the assistant did not share that information

with Ms. Gunter. (*See* Ex. 18 at KPG 14; Ex. 113.) Ms. Gunter contends that Mr. Shea's and the rest of IA's failure to attend the team meeting on October 26, 2022, was discriminatory and harassing.

59.    Following this incident, Ms. Gunter advised Ms. Bowman that she could not provide a good evaluation for Mr. Shea that year given all the issues she had had with him and his department. (*See* Ex. 18 at KPG at 15.) She also sent Ms. Bowman a list of twenty-five examples of Mr. Shea's "resistance and hostility" over the years. (*Id.* at KPG 10.)

60.    At the same time, Ms. Gunter was trying to follow-up with Mr. Johnson about the status of her discrimination complaint against Mr. Shea. To that end, she sent him the same list of incidents that she characterized as Mr. Shea's "pattern of harassment and hostile work environment." (Ex. 170 at DREXEL_GUNTER_346.) She also told Mr. Johnson that these were just some examples of Mr. Shea's problematic conduct. (*See* Tr. Day 3, 30:1-2.) According to Ms. Gunter, these sorts of incidents happened "continuously." (*Id.* at 30:7.) From her perspective, whenever she "said anything to [Mr. Shea] that he perceived as in any way ... work related, there was hostility[.] [T]here was harassment towards [her]." (*Id.* at 7-10.)

61.     Eventually,[8] Mr. Johnson hired an outside attorney to investigate Ms. Gunter's complaints about Mr. Shea and IA. The investigation ended in May 2023, with the investigator concluding that Mr. Shea did not engage in race- or gender-based discrimination or harassment against Ms. Gunter.

62.     On December 6, 2022, Ms. Bowman wrote to Mr. Shea that as of that date, the IA Department would no longer report to Ms. Gunter. (*See* Ex. 19.) Instead, Ms. Bowman would take over as Mr. Shea's administrative manager. Ms. Gunter contends that Mr. Shea (and Mr. D'Arco, to some extent) subjected her to a hostile work environment from her arrival at Drexel until she stopped being Mr. Shea's administrative supervisor.

## II.     CONCLUSIONS OF LAW

63.     To establish hostile work environment claims under Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981, Ms. Gunter must prove: "(1) she suffered intentional discrimination because of her race or sex; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected her; (4) the discrimination would detrimentally affect a reasonable person in like circumstances; and (5) [there was] *respondeat superior* liability." *Nitkin v. Main Line Health*, 67 F.4th 565, 570 (3d Cir. 2023) (quotation omitted).[9]

---

[8]     Though Ms. Gunter first raised her concerns with Mr. Johnson in late July 2022, for a variety of reasons, Mr. Johnson did not open an investigation until February 2023.

[9]     The standard is the same for a Section 1981 claim. *See Castleberry v. STI Grp.*, 863 F.3d 259, 263 (3d Cir. 2017) (quotation omitted).

### A.    Intentional Discrimination

64.    "[O]vert racial [or sex-based] harassment is not necessary to establish a hostile environment." *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1083 (3d Cir. 1996). Instead, "[a]ll that is required is a showing that race [or sex] is a substantial factor in the harassment, and that if the plaintiff had been white [or male] she would not have been treated in the same manner." *Id.* (citation omitted).

65.    Fortunately, "direct evidence of intentional discrimination is hard to come by" in modern employment discrimination cases. *Greater Philadelphia Chamber of Com. v. City of Philadelphia*, 949 F.3d 116, 153 (3d Cir. 2020). And while that development is a welcome one, it makes the factfinder's task "a little more difficult." *Aman*, 85 F.3d at 1082. That is true in this case, where there is no evidence of race- or sex-based derogatory epithets, comments, or jokes. In these instances, courts "must be increasingly vigilant in their efforts to ensure that prohibited discrimination is not approved under the auspices of legitimate conduct[.]" *Id.* As the finder of fact, I have strived to do so here.[10]

### 1.    Comparators

66.    Factfinders can infer discriminatory intent "from the fact of disparate treatment of members of different [protected classes] in similar factual circumstances."

---

[10]    Many years ago, the Third Circuit lamented that workplace discrimination "is often simply masked in more subtle forms" and that "[i]t has become easier to coat various forms of discrimination with the appearance of propriety, or to ascribe some other less odious intention to what is in reality discriminatory behavior." *Aman*, 85 F.3d at 1082. I have turned to those words many times throughout the fact-finding process in this case.

*Bluebeard's Castle Hotel v. Gov't of Virgin Islands, Dep't of Lab.*, 786 F.2d 168, 171 (3d Cir. 1986). To create an inference of intentional discrimination via comparator evidence, the "comparator employees need not be identical but must be similarly situated in 'all material respects.'" *Qin v. Vertex, Inc.*, 100 F.4th 458, 474 (3d Cir. 2024) (quotation omitted). Relevant factors "include whether the employees dealt with the same supervisor, were subject to the same standards, ... shared similar job responsibilities[,]" *id.*, and "engaged in the same conduct ...." *In re Trib. Media Co.*, 902 F.3d 384, 403 (3d Cir. 2018) (citation omitted). "An employee who holds a different job title or works in a different department is not similarly situated." *Qin*, 100 F.4th at 474. The comparator evidence on which Kim Gunter relies falls short of convincing me that Bill Shea subjected her to intentional discrimination because of her race, color, or sex.

67.    As an initial matter, John Fry is not an appropriate comparator because he was not similarly situated to Ms. Gunter. Ms. Gunter and President Fry had different job titles and responsibilities. There is really no comparison between Ms. Gunter—Mr. Shea's administrative supervisor—and President Fry. And because President Fry is not a valid comparator, I have not considered any evidence of his alleged interference with Mr. Shea's or IA's operations or Mr. Shea's response(s) thereto.

68.    Helen Bowman is an appropriate comparator only for the periods of time when she served as Mr. Shea's administrative manager—from January 1, 2018, to July 7, 2019, and then again from December 6, 2022, to July 7, 2024. However, much of the

28

evidence on which Ms. Gunter relies pertains to incidents that occurred when Ms. Bowman was **not** acting in that capacity. (*See* ECF No. 142 at ¶¶ 122, 124; Exs. 148, 156.) In those periods of time, Ms. Bowman was not similarly situated to Ms. Gunter and cannot serve as a comparator.

69.    Even when Ms. Bowman served as Mr. Shea's administrative manager, the evidence on which Ms. Gunter relies falls short. Ms. Gunter contends that in January 2023, Ms. Bowman interfered with Mr. Shea's independence by directing him to reschedule an internal audit for the Enrollment Management department, yet Mr. Shea did not protest or complain about her impeding his operations. However, this evidence is not compelling because the email thread makes clear that the directive to reschedule the audit came from President Fry, and Ms. Bowman made this request on his behalf. (*See* Ex. 149.) The same is true with respect to Ms. Bowman's comment about the allocation of audit hours. (*See* Ex. 156.) In other words, even if this is evidence of interference with Mr. Shea's department, it shows interference by President Fry, not Ms. Bowman.[11]

70.    Ed Longazel is an appropriate comparator, but only for some conduct. He held the same position as Ms. Gunter and had administrative oversight over Mr. Shea during that time. Writ large, though, Mr. Longazel exercised his administrative oversight over Mr. Shea and IA in a different way than Ms. Gunter. In fact, all the testimony reflected

---

[11]    Even if the evidence demonstrated that Ms. Bowman interfered with Mr. Shea's independence without his objection, such evidence would undermine Ms. Gunter's claim that Mr. Shea intentionally discriminated against her because of her sex.

that Mr. Longazel exercised very little oversight over IA and did not interact much with Mr. Shea or the individual members of IA, whereas Ms. Gunter was much more involved. For instance, she held regular meetings with members of IA on an individual and a team-wide basis. The stark difference between Mr. Longazel's and Ms. Gunter's respective management styles makes it difficult to treat Mr. Longazel as a true comparator. *See In re Trib. Media Co.*, 902 F.3d at 403.

71.     Ms. Gunter grounds her belief that Mr. Shea discriminated against her because Mr. Shea did not treat Mr. Longazel the same way. (*See* Tr. Day 3, 28:15 – 29:15.) However, in many instances, Ms. Gunter has not demonstrated that she and Mr. Longazel engaged in similar conduct. This leaves me with nothing to compare. Comparator evidence can be compelling evidence of discriminatory intent where it shows "disparate treatment of members of different [protected classes] ***in similar factual circumstances***." *Bluebeard's Castle*, 786 F.2d at 171 (emphasis added). Indeed, where the only difference between a plaintiff and her comparator is their protected class(es), it permits a factfinder to infer that any differential treatment was due to the plaintiff's protected class.

72.     Many of the incidents about which Ms. Gunter complains, however, have no analog during Mr. Longazel's time in charge. Mr. Longazel never had team meetings that included members of IA, so there's no way to gauge how Mr. Shea might have behaved during those meetings. Mr. Longazel never had one-on-one meetings with individual IA team members. Mr. Longazel never distributed news of their merit increases either. Mr.

Longazel never created a newsletter for OCPIA. Mr. Longazel never made announcements to the IA team.  Mr. Longazel never asked Mr. Shea to serve as his proxy in his absence. Mr. Longazel never inquired about IA disciplinary issues. Because Mr. Longazel didn't do these things, there's no way for me to compare Mr. Shea's reaction to them under Mr. Longazel to Mr. Shea's reaction to them under Ms. Gunter.

73.     Even for incidents where there might be a factual analog, other differences between Ms. Gunter and Mr. Longazel (aside from their respective race, color, and sex) prevent me from inferring discrimination. According to Mr. Longazel, he stayed in his lane and confined his administrative oversight over Mr. Shea and IA to tasks like reviewing and approving time sheets and expense reports, approving Mr. Shea's vacation, reviewing and assisting with budgets, and conducting performance evaluations for Mr. Shea. The two of them had very little interaction, and he had almost no interaction with individual members of IA. Ms. Gunter did more, even if it still fell within the purview of administrative oversight.

74.     When it came to Mr. Shea and IA, if Ms. Gunter did anything other than payroll and budgetary matters, Mr. Shea resisted. But I can't infer based on a comparison to Mr. Longazel that Mr. Shea resisted because Ms. Gunter is a Black, African American woman. Mr. Longazel never went beyond the bare minimum in terms of his administrative oversight over Mr. Shea and IA, and that difference in management style is what drove Mr. Shea's response.

75. However, there were some instances in which Ms. Gunter engaged in similar behavior as Mr. Longazel, yet Mr. Shea's response was different. For example, Mr. Shea had no problem working with Mr. Longazel on the OCPIA website when their two offices merged. Yet, when Ms. Gunter asked for his help to update the IA website, Mr. Shea refused. Similarly, Mr. Shea never complained about IA's involvement with ERM during Mr. Longazel's tenure. On the contrary, Mr. Longazel testified that Mr. Shea "was excited about ERM." (Tr. Day 1, 244:15.) But that changed once Ms. Gunter arrived at Drexel. Mr. Shea pulled Raffaele Fusca from working on ERM and disclaimed any IA involvement with the committee. Likewise, Mr. Shea's and Mr. Longazel's offices would collaborate in certain instances, sharing resources and expertise where they could be helpful. But when Ms. Gunter arrived, Mr. Shea took the position that IA and Compliance should not have any involvement with one another. Mr. Shea also never raised concerns about Mr. Longazel interfering with his independence when they met on a quarterly basis to discuss IA's upcoming audits. But when it came to Ms. Gunter, Mr. Shea "didn't want to cooperate" and didn't want to talk with Ms. Gunter about risks that IA would investigate or know about. (Tr. Day 2, 167:21.)

76. Finally, when Mr. Shea thought that Mr. Longazel had interfered with his independence by reporting an incident to senior management on behalf of IA while Mr. Shea while was out on vacation, he did not complain to Ms. Bowman, Mr. Williams, or the Audit Committee. Yet, within Ms. Gunter's first year at Drexel, Mr. Shea complained to the

Audit Committee and Ms. Bowman that Ms. Gunter was interfering with his office's independence.[12]

77.    Based on all of this, I conclude that Mr. Shea resisted Ms. Gunter's attempts to exercise supervisory authority over him because (a) he was staunchly protective of IA's independent function, and (b) he wanted to remain "in charge" of IA, not concerns about her race, color, or gender.

78.    The evidence makes clear that Mr. Shea had a genuine concern for maintaining IA's independence. At trial, Ms. Gunter presented substantial evidence that Mr. Shea's concerns were beyond what professional guidelines require for independence. She also established that no one else in Drexel's leadership concluded that Ms. Gunter did anything to interfere with IA's independence. But none of that matters. What matters is whether Mr. Shea believed the concerns that he voiced or whether he used them as cover for an intent to discriminate. In that respect, I have no doubt that Mr. Shea subjectively believed that the things about which he complained jeopardized IA's independence.

79.    Mr. Shea had always been concerned about maintaining IA's independence, long before Ms. Gunter arrived at Drexel. He "was passionate about independence" and would "raise it at any point that it presented to him." (Tr. Day 1, 233:14-15, 18.) For example, when the Compliance and Privacy Office first merged with IA and Mr. Longazel assumed

---

[12]    There is no evidence in the record that Ms. Gunter ever interfered with Mr. Shea's or IA's independence during her time at Drexel. Indeed, the Audit Committee never viewed any action by Ms. Gunter as imping or interfering with IA's operations.

administrative oversight over Mr. Shea, "it was clear" to Mr. Longazel that Mr. Shea "was concerned about his independence." (Tr. Day 1, 219:4-5.) As a result, the two of them "did a fair amount of wordsmithing" regarding each department's roles on the website and in announcements about the merger under one Vice President. (*Id.* at 219:5-8.) This is similar to the concerns that Mr. Shea raised over the course of Ms. Gunter's tenure regarding the separation between the two offices and the reporting structure. Mr. Shea also raised concerns about independence while Ms. Bowman served as his administrative supervisor. (*See id.* at 277:14-19.)Mr. Shea's history of protecting his and IA's independence undermines any suggestion that he started using independence as a cover or pretext for his treatment of Ms. Gunter.

80.    In addition to being protective of IA's independent function, Mr. Shea was protective of his authority over IA. Megan Weyler testified that Mr. Shea could come across as arrogant and would question authority, noting that his "personality could be difficult at times." (Tr. Day 1, 103:18.) She experienced pushback from Mr. Shea on occasion. Other evidence also demonstrates Mr. Shea's territorial nature, at least when it came to IA. For example, aside from his concerns relating to independence, Mr. Shea took issue with Ms. Gunter's inclusion of IA in her 100-Day Report because he viewed her as taking credit for "all these great things" that he and his team were doing. (Shea Dep. 188:22.) From Mr. Shea's perspective, those were his "achievement[s]." (Shea Dep. at 188:24.) As such, in his view, Ms. Gunter should not have included them in a summary of her first 100 days.

81.     Mr. Shea also did not like the fact that Ms. Gunter's initiatives could create the wrong impression "about who is **in charge of** Internal Audit." (*Id.* at 170:19-22 (emphasis added).) In other words, Mr. Shea was concerned that he was not "**100 percent in charge** of Internal Audit as it's always been." (Shea Dep. 185:16-17 (emphasis added).) Similarly, Mr. Shea bristled when Ms. Gunter announced merit increases to members of IA because he thought he should be the one to send them, as head of the department.

82.     Before Ms. Gunter arrived at Drexel, Mr. Longazel gave Mr. Shea "the autonomy to go run internal audit" and did not involve himself in IA's affairs. (Tr. Day 1, 32:12-16.) Mr. Longazel focused on Compliance and Privacy, and he let Mr. Shea "handle internal audit activities" as he saw fit. (*Id.* at 245:1-5.) Thus, I have little difficulty concluding that Mr. Shea did not like it when Ms. Gunter arrived and became more involved with IA, even if her involvement did not impede on IA's operations or its independence. To go from having near-total autonomy over a department to having to report to a supervisor who expected updates, deliverables, and communication would not be easy.[13] It was not easy for Mr. Shea, and he struggled mightily with this new way of doing things.[14]

---

[13]     In the Third Circuit, fact finders "should use [their] common sense in weighing the evidence. Consider it in light of [their] everyday experience with people and events, and give it whatever weight [they] believe it deserves.  If [their] experience tells [them] that certain evidence reasonably leads to a conclusion, [they] are free to reach that conclusion." United States Court of Appeals for the Third Circuit, General Instructions for Civil Cases, 1.5 Evidence, at 8 (Last updated September 2024), *available at* https://www.ca3.uscourts.gov/model-civil-jury-table-contents-and-instructions.
[14]     Not all the blame lies with Mr. Shea. Drexel did a poor job of communicating its expectations to Mr. Shea and making sure that he adhered to those expectations.

83.     Indeed, Mr. Shea testified that most of the alleged discriminatory incidents occurred when Ms. Gunter "was trying to act as [his] manager[.]" (Shea Dep. 299:3-5.) And Ms. Gunter established that when she attempted to exert any authority or direction over Mr. Shea, he had a problem with it. In short, if Ms. Gunter did anything more than the bare minimum that Mr. Longazel had done, Mr. Shea resisted. He was concerned that Ms. Gunter's management style might interfere with IA's independence, and he was also protective of his own control over the office. That explains why Mr. Shea resisted or took issue when Ms. Gunter exerted—or attempted to exert—any administrative authority over him or his department.

84.     On the other hand, when Ms. Gunter interacted with Mr. Shea on a non-work-related basis, they had no problem getting along. For example, if the two of them were discussing personal matters, Mr. Shea was cordial towards Ms. Gunter.[15] However, he clammed up and resisted any time Ms. Gunter attempted to discuss anything that Mr. Shea perceived as work-related, including administrative matters that fell within her purview. (*See* Tr. Day 3, 30:7-10.) That's when Mr. Shea acted in a way that Ms. Gunter felt was hostile and harassing.

85.     If Mr. Shea were treating Ms. Gunter differently because of her status as a Black, African America woman, then one would expect that he would always do so. In other

---

[15]     For example, when Ms. Gunter texted her direct reports about the Covid-19 office closure, Mr. Shea questioned why she was sending her that text. However, in subsequent texts about her health, Mr. Shea's messages "were cordial." (Ex. 18 at KPG 11.)

words, the fact that Mr. Shea was cordial to Ms. Gunter and treated her with respect when they were discussing personal, non-work-related matters undermines Ms. Gunter's claim that Mr. Shea treated her differently because of her race, color, or sex. Presumably, if that were the case, he would have been disrespectful all the time or would have refused to interact with her at all. Instead, however, Mr. Shea's alleged hostility arose only when Ms. Gunter attempted to exert any authority over him or tried to direct his activities, even if they were administrative in nature.

86.     Ms. Gunter is the only witness who believes that Mr. Shea discriminated against her based on her protected characteristics. Indeed, the other witnesses—Mr. Williams,[16] Ms. Weyler,[17] Mr. D'Arco,[18] Ms. Bowman,[19] and Mr. Johnson[20]—testified that they did not think that Mr. Shea treated Ms. Gunter differently because of her race, color, or sex.

87.     Some of these witnesses are men; some are women; some are White; and some are Black. Yet they all reached the same conclusion. Drexel's outside investigator also determined that Mr. Shea did not engage in race- or gender-based discrimination or harassment against Ms. Gunter. (*See* Ex. 174 at 63.) These facts buttress my independent

---

[16]     Tr. Day 1, 61:1-12; 63:23-25.
[17]     Tr. Day 1, 97:7-15; 99:9-11; 103:5-8.
[18]     Tr. Day 1, 164:16-20; 168:8-11.
[19]     Tr. Day 2, 82:1-8; 84:1-4; 84:15-20; 85:10-14; 86:11-14; 92:17-20; 92-24 – 93:3; 96:3-7; 97:21-25; 99:2-9.
[20]     Tr. Day 2, 116:19 – 117:2; 117:15 – 118:4; 120:5-9; 121:16-22; 125:1-8; 125:22 – 126:21.

conclusion that Mr. Shea did not subject Ms. Gunter to intentional discrimination based on her race, color, or sex.[21] Instead, I conclude that Mr. Shea's reaction to Ms. Gunter had to do with her management style, which Mr. Shea did not like because he felt that it threatened IA's independence and his own control over IA. While that does not make him an easy employee, it also does not demonstrate that he was acting on the basis of race, color, or gender.

### 2. Microaggressions and Code Words

88.     Aside from comparator evidence, Ms. Gunter also contends that Mr. Shea's and Mr. D'Arco's conduct towards her constituted discriminatory microaggressions. A microaggression is "a comment or action that subtly and often unconsciously or unintentionally expresses a prejudiced attitude toward a member of a marginalized group (such as a racial minority)." *Merriam-Webster Dictionary* (last accessed January 12, 2026). And some courts have recognized that "modern discrimination can be communicated through microaggressions." *In re Miller*, 323 A.3d 984, 998 n.8 (Vt. 2024) (Waples, J., dissenting).

---

[21]     Ms. Bowman's comment that Mr. Shea does not respect women does not alter my conclusion as to whether he subjected Ms. Gunter to discrimination based on her sex. Despite making this comment, Ms. Bowman disavowed it and testified that she "never" reached a conclusion that Mr. Shea did not respect women. (Tr. Day 3, 127:16.) She also testified that Mr. Shea treated everyone at Drexel equally. And even if Ms. Bowman held that opinion at some point in time, her opinion is just that—an opinion. It is not evidence that Mr. Shea's subsequent treatment of Ms. Gunter was based on her sex.

89.     There are two problems with Ms. Gunter's theory, however. *First*, many of the events about which Ms. Gunter complains were not aggressions that Mr. Shea or anyone else directed at her at all. They were innocent workplace misunderstandings.

a.     Mr. Shea's failure to include Ms. Gunter in his hiring process for Mr. D'Arco reflected Mr. Shea conducting himself the way he had under Mr. Longazel. There's no evidence that Ms. Gunter instructed him to proceed differently or that he disregarded her instructions.

b.     When Mr. Shea responded to Ms. Bowman's email about the Dean's complaint in September 2019 before he spoke to Ms. Gunter about the issue, there's no evidence that Mr. Shea saw Ms. Gunter's directive before he contacted Ms. Bowman.

c.     Mr. Shea's resistance to Ms. Gunter's request to establish a new email box for IA was not an aggression directed at Ms. Gunter. Mr. Shea articulated a reason for his position. He was entitled to express disagreement with Ms. Gunter without it turning into an aggression, and Ms. Gunter offers no evidence other than her say-so that he was expressing an aggression towards her.

d.     Mr. Shea's request that Ms. Gunter include Mr. D'Arco in virtual leadership meetings during the Covid-19 pandemic was not an aggression directed towards her. It was an innocent request based on, at worst, Mr. Shea's misunderstanding of who Ms. Gunter intended to participate in the meetings.

e.    Mr. Shea's and Mr. D'Arco's preparation of Audit Committee meeting minutes in September 2020, in which they corrected what they perceived as typos in Ms. Gunter's revisions, was not an aggression directed towards her. It was an effort to ensure that the minutes were prepared correctly.

f.    Mr. Shea's discussions with Ms. Gunter about the ERM, including his request that Mr. Fusca stop taking notes for ERM and his request to remove a reference to IA in a slide deck was an example of ordinary, day-to-day interactions in a workplace, not aggressions directed at Ms. Gunter.

g.    Mr. D'Arco's failure to turn on his camera during the introductory meeting with Mr. Johnson was not an aggression directed at Ms. Gunter. It was an example of Mr. D'Arco doing something to ensure his ability to participate in the meeting and to avoid buffering that would result from an internet connection that could not support the video feed.

h.    Mr. Shea's failure to inform Ms. Gunter about the HR investigation in July 2022 was a function of Mr. Shea following Mr. Johnson's instructions, though perhaps a bit too closely. It was not an aggression directed at Ms. Gunter.

i.    The IA team's failure to attend a monthly virtual meeting with Ms. Gunter on October 26, 2022, the day after she returned from leave, was not an aggression. Mr. Shea had informed Ms. Gunter's assistant (twice) that IA would not be in attendance,

and it was not clear that Ms. Gunter would conduct the meeting at all because she had not done so during her leave. At most, this was a miscommunication, not an aggression.

90.     *Second*, to the extent any events were microaggressions, Ms. Gunter has not demonstrated that they resulted from race-based, color-based, or gender-based animus. Ms. Gunter's characterization of Mr. Shea's and Mr. D'Arco's conduct as microaggressive is just that—***her*** characterization. And her subjective beliefs about their motivation or mindset is not evidence. Indeed, "[s]ubjective evaluation alone cannot constitute a hostile work environment[.]" *Byrne v. Am. Soc'y for Prevention of Cruelty to Animals*, No. 22-cv-7062, 2025 WL 1566642, at *6 (E.D.N.Y. June 3, 2025).

91.     Admittedly, distinguishing between a common, workplace slight and a microaggression based on a protected category is not any easy task. Ms. Gunter has not suggested how I would make such an evaluation. Instead, she testified that "[a]s an African American woman, I don't need somebody to make a racial statement to me for it to be discriminatory and based on race." (Tr. Day 2, 217:13-15.) While I do not purport to know how one would prove that a comment or conduct crosses the line to a microaggression, I am confident that plaintiffs alleging employment discrimination must produce something more than their say-so.[22] Ms. Gunter has not done that in this case, and her characterization

---

[22]     In an unreported decision, the Third Circuit explained that a plaintiff "cannot sustain a claim simply by asserting an event and then asserting that it was motivated by racial bias." *Davis v. City of Newark*, 285 F. App'x 899, 903 (3d Cir. 2008).

of Mr. Shea's and Mr. D'Arco's conduct as microaggressive is not enough to convince me that their treatment of her was based on her race, color, or sex.

92.    The same is true of Ms. Gunter's argument that Mr. Shea fell back on racial tropes and used coded language when he interacted with her. She contends that when Mr. Shea made comments about not arguing with her and referred to her tone, Mr. Shea was implying that she was an angry Black woman. (*See, e.g.*, Tr. Day 2, 241:4 – 242:4.) Ms. Gunter contends that Mr. Shea did not accuse non-African American, Black, female Drexel administrators of "arguing" with him when they spoke to him in a direct manner, nor did he make comments about their tone. But, of course, Ms. Gunter was not privy to every email or conversation Mr. Shea had with other Drexel administrators, nor was she able to provide the context of those discussions.

93.    Certainly, "words that appear facially neutral" and "code words" can be evidence of an intent to discriminate. *Gharzouzi v. Nw. Hum. Servs. of Penn.*, 225 F. Supp.2d 514, 535 (E.D. Pa. 2002); *Aman*, 85 F.3d at 1083. In this case, however, Mr. Shea's comments about "not arguing" with Ms. Gunter and her tone do not "send a clear message [or] carry the distinct tone of racial motivations and implications." *Aman*, 85 F.3d at 1083. Thus, I cannot conclude that Mr. Shea relied on racial tropes or that these comments are evidence of his intent to discriminate against Ms. Gunter based on her status as a Black, African American woman.

42

B.    **Severe Or Pervasive**

94.    Even if Ms. Gunter could demonstrate that Mr. Shea subjected her to intentional discrimination, she still would not prevail on her hostile work environment claims because the alleged discrimination was not severe or pervasive.

95.    A hostile work environment is one that is "permeated with 'discriminatory intimidation, ridicule, and insult[.]'" *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S. Ct. 367, 370, 126 L. Ed. 2d 295 (1993) (quotation omitted). "For discrimination to constitute severe or pervasive behavior, it must 'alter the conditions of [the victim's] employment and create an abusive working environment.'" *Nitkin*, 67 F.4th at 570 (quotation omitted). "To determine whether an environment is hostile, a court must consider the totality of the circumstances, including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Id.* (same). "'[C]onduct must be extreme' to satisfy this standard, so 'simple teasing, offhand comments, and isolated incidents (unless extremely serious)' are inadequate." *Id.* (same).

96.    As I indicated during closing arguments, the conduct at issue in this case is not severe enough to constitute a hostile work environment. All of Mr. Shea's comments were race/color/sex-neutral, and there is no evidence that he engaged in conduct that was physically threatening or humiliating. He did not use any slurs or engage in any acts of intimidation. His conduct—which, in the light most favorable to Ms. Gunter constitutes

insubordination, disrespect, and questioning her authority—is a far cry from the extreme conduct that constitutes severe discrimination. *See, e.g.*, *Castleberry v. STI Grp.*, 863 F.3d 259, 265 (3d Cir. 2017) (supervisor's use of racial slur accompanied with threats of termination was enough to plead severe discrimination); *Jensen v. Potter*, 435 F.3d 444, 452 (3d Cir. 2006), *overruled on other grounds by*, *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006) (physical threats and damage to plaintiff's car was severe discrimination); *Durham Life Ins. Co. v. Evans*, 166 F.3d 139, 146, 151 (3d Cir. 1999) (severe discrimination where managers "publicly mocked [plaintiff] for her walk and her speech" and belittled her for being "a goddamn woman").

97.     Absent severe discrimination, "other, less objectionable, conduct will contaminate the workplace only if it is pervasive." *Castleberry*, 863 F.3d at 264 (quotation omitted). Ms. Gunter contends that Mr. Shea's alleged discrimination was "pervasive as it started from July 8, 2019 her date of hire until December 6, 2022," when he stopped reporting to her. (ECF No. 142 at 47 ¶ 30.) She also characterizes it as a "pattern." (Tr. Day 3, 29:18-19.) But that does not tell me anything about the ***frequency*** with which the alleged discrimination occurred.

98.     Ms. Gunter testified that aside from the specific incidents that she identified as discriminatory and harassing over the years, "there were many, many more things that happened on a daily basis, and more often." (Tr. Day 2, 222:1-2.) But I cannot give much weight to that testimony because she hasn't told me what those things were. At most, she

testified that whenever she "said anything to [Mr. Shea] that he perceived as in any way ... work related, there was hostility[.] [T]here was harassment towards [her]." (*See* Tr. Day 3, 30:7-10.) But I still do not know how often that occurred.

99.     To the extent Ms. Gunter contends that Mr. Shea committed daily acts of disrespect and insubordination, I find that testimony incredible. Indeed, if that were the case, Ms. Gunter would have done more to address the issue, either by lodging more complaints with Ms. Bowman or HR or by taking disciplinary action against Mr. Shea. The record does not reveal either. Moreover, her contemporaneous notes and communications from her time at Drexel make no mention of harassment by Mr. Shea on a daily basis. In fact, the evidence reveals that Ms. Gunter and Mr. Shea did not interact daily, especially for the extended time that they were working remotely during the Covid-19 pandemic.

100.     When it comes to specifics, Ms. Gunter "identified sporadic ... actions," some of which are separated in time by many months. *Deans v. Kennedy House, Inc.*, 998 F. Supp. 2d 393, 415–16 (E.D. Pa.), *aff'd*, 587 F. App'x 731 (3d Cir. 2014). As such, the specific offhand comments and isolated incidents she points to over the years did not occur with the frequency needed to establish pervasiveness.

101.     Ms. Gunter points to 24 specific incidents that occurred during a more than 40-month time period that she contends were discriminatory.[23] I've already determined

---

[23]     Ms. Gunter's emails to Ms. Bowman and Mr. Johnson detailed 25 individual incidents (Exs. 18, 170), but one of them is not supported by the record—Drexel did not change Ms. Gunter's title at Mr. Shea's request.

that they were not discriminatory, but even if they were, they were not frequent enough to establish pervasiveness. These incidents were sporadic, In some instances, many months went by between the alleged acts of discrimination. For example, Ms. Gunter does not allege any incidents between January and July 2021 or between August 2021 and January 2022.

102.    To illustrate the point, Ms. Gunter has identified 24 incidents that occurred from July 8, 2019, until December 6, 2022. That's a span of 1,247 days, meaning Ms. Gunter has alleged an incident roughly once every 52 days. That's not enough to qualify as pervasive. Even if I credit Ms. Gunter's testimony that there were many more such incidents, and I assume that the all of those incidents were actual aggressions directed at her and all tied to her race, color, or gender, it wouldn't be enough. For example, if there were twice as many incidents, it still would only be once every 26 days. Four times as many incidents would be once every 13 days. Even then, the incidents would be sporadic, not constant. And all of this requires speculation because Ms. Gunter did not offer any proof of the nature or frequency of the other events that she claims occurred.

103.    Ultimately, even if the facially-neutral incidents are microaggressions—which Ms. Gunter has not proven—"federal law does not remedy racially hostile work environments absent evidence of severe or pervasive conduct altering the terms of the employment because of [a protected characteristic]." *Blango v. City of Philadelphia*, 643 F.

Supp. 3d 535, 537 (E.D. Pa. 2022). Thus, her hostile work environment claims fail for this reason as well.

### C.    Reasonable Person In Like Circumstances

104.    There is no question that Mr. Shea's conduct detrimentally affected Ms. Gunter, and Drexel does not contend otherwise. However, Ms. Gunter's hostile work environment claim fails because she has not convinced me that Mr. Shea's conduct would detrimentally affect a reasonable person in like circumstances.

105.    While I do not intend to minimize what were upsetting incidents for Ms. Gunter, I cannot conclude that the incidents of discrimination she points to were anything other than misunderstandings or petty, workplace slights from someone who was not used to a manager having any real oversight over what he viewed as "his" department.[24] Mr. Shea was also a stickler when it came to maintaining IA's independence, and what he perceived as interference with that independence evoked a reaction from him. But his reactions were not so outsized that they would have caused a reasonable person such anguish.

106.    A reasonable person in Ms. Gunter's shoes would find some of Mr. Shea's conduct to be rude or disrespectful. His explanation that Ms. Gunter's administrative authority was based on a need for someone—*i.e.*, Ms. Gunter—to sign his time sheet is

---

[24]    When Mr. Shea refused to tell Ms. Gunter about the HR incident involving Mr. D'Arco and Mr. Fusca, Ms. Gunter asked Mr. Shea if "he ever had a manager before." (Ex. 102 at KPG 1015.)

dismissive of her role as a VP at Drexel and his superior.[25] The same is true of his statement that he did not want to be a member of the Compliance Committee but would participate because Mr. Williams—as opposed to Ms. Gunter—required it. And some of his texts and emails with Ms. Gunter are curt.

107.    But nearly all the incidents of alleged discrimination are trivial incidents. This includes things like not working with Ms. Gunter on updating the office website; challenging collaboration items in her 100-Day Report; complaining that IA staff found out about their merit increases from Ms. Gunter rather than Mr. Shea; not wanting a separate mailbox for IA when Ms. Gunter suggested it; telling Ms. Gunter to run things by him before communicating with his team; complaining when Drexel administrators asked Ms. Gunter for information that Mr. Shea was responsible for providing; challenging the inclusion of IA articles in a newsletter Ms. Gunter created; refusing to implement Ms. Gunter's edits to Audit Committee minutes and pointing out her typos; pulling his staff member from working on the ERM Committee; identifying "clean up items" for Ms. Gunter with respect to the website, her bio, and the newsletter; failing to address a direct report's insubordinate behavior after Ms. Gunter complained about it; leaving Ms. Gunter out of communications regarding an office move; and failing to attend to a previously scheduled meeting.

---

[25]    Even if Mr. Shea's comment was discriminatory or harassing, he did not direct it at Ms. Gunter because she was not present at the meeting in which he made the comment.

108.    A reasonable person in similar circumstances might find Mr. Shea's behavior frustrating, especially considering he was Ms. Gunter's direct report. At the same time, however, it is incredibly petty. No matter how frustrating these incidents are, they would not create an **abusive** working environment for a reasonable person. Instead, I conclude that that Ms. Gunter was a "hypersensitive employee." *See Shramban v. Aetna*, 262 F. Supp. 2d 531, 537 (E.D. Pa. 2003), *aff'd*, 115 F. App'x 578 (3d Cir. 2004).

109.    Even Ms. Gunter's therapist, Dr. Shelley Goodman, testified that while she was seeing Ms. Gunter, Ms. Gunter was easily agitated with other people's normal behaviors and had a low frustration tolerance. (ECF No. 135 at 78:7 – 79:6.) And Drexel's expert, Dr. Alexis Beattie, relied on this observation (as documented in Dr. Goodman's treatment notes) when she rendered her own opinion that Ms. Gunter "has a disproportionate response to normal stimuli such as professional disagreements and perceived slights." (ECF No. 121 at ¶ 14(e)(ii).) As a result, she is "more prime to have a disproportionate reaction to something that another person may not have a reaction to." (Tr. Day 2, 265:15-17.) Like Dr. Beattie, I place weight on Dr. Goodman's observation because it is "a statement made in [Ms. Gunter's] private psychotherapy notes that is an impression of her long-term therapist as to how she interacts with the world." (Tr. Day 2, 265:5-8.) This testimony further supports my finding that Ms. Gunter was hypersensitive. That hypersensitivity caused Ms. Gunter's upset, but the same behavior would not have affected a reasonable employee.

110.    Ms. Gunter's evidence on this issue—Ms. Bowman's, Mr. Williams's, and Ms. Weyler's contemporaneous observations about Mr. Shea's and Mr. D'Arco's conduct—does not convince me otherwise. Their characterizations of individual instances of behavior as surprising,[26] disappointing,[27] upsetting,[28] odd,[29] unnecessary,[30] questioning authority,[31] difficult,[32] disrespectful,[33] antagonistic,[34] frustrating,[35] or even stressful[36] all fall short of the abusive conditions needed to create an objectively hostile work environment. Moreover, most of these characterizations pertain to just a handful of the incidents that Ms. Gunter contends were discriminatory in nature, not to all of them.

111.    The reality is that not every workplace relationship will be smooth. It's a fact of life that some people don't get along with each other. And sometimes, that happens in the context of a supervisory relationship. Prickly behavior towards a supervisor is a workplace challenge for the supervisor, but it doesn't convert the relationship, or the workplace environment as a whole, into an abusive one. The relationship between Ms. Gunter and Mr. Shea was prickly, but Ms. Gunter's response to it was outsized for the level

---

[26]    Tr. Day 1, 40:16-18.
[27]    Ex. 2 at DREXEL_GUNTER_9938.
[28]    Ex. 2 at DREXEL_GUNTER_9938.
[29]    Ex. 2 at DREXEL_GUNTER_9937.
[30]    Tr. Day 1, 79:14-15; Ex. 8 at KPG 68.
[31]    Tr. Day 1, 98:24-25.
[32]    Tr. Day 1, 103:18.
[33]    Ex. 4 at DREXEL_GUNTER_2776.
[34]    Tr. Day 2, 62:22 – 64:21.
[35]    Ex. 100 at KPG 1088.
[36]    Ex. 104 at KPG 1061.

of difficulty it posed. In short, it would not have affected a reasonable person in the same way.

III.    **CONCLUSION**

Ms. Gunter starts with the assumption that the only salient difference between her and Mr. Longazel is the difference in protected classes. From that assumption, she jumps to the conclusion that every challenging interaction she had with Mr. Shea must have resulted from that difference. But there was far more at play than she lets on. She had a different management style than Mr. Longazel, and a different personality. Those differences contributed to her difficulty with Mr. Shea. She therefore has not proven that Mr. Shea took any action based on her race, color, or gender. She also has not shown that the conduct that she considers discriminatory was pervasive. Finally, Ms. Gunter was hypersensitive to the conduct that she considered discriminatory, and she perceived insult and abuse that a reasonable person would not. Ms. Gunter has proven that she had a contentious, prickly relationship with Mr. Shea and that his concerns about independence were at times overblown. But in the end, that just tells the story of a challenging workplace relationship, nothing more. It does not create a hostile, discriminatory workplace. I will therefore enter judgment in Drexel's favor. An appropriate Order follows.

**BY THE COURT:**

*/s/ Joshua D. Wolson*
JOSHUA D. WOLSON, J.

February 9, 2026